Justice LEE,
opinion of the Court:
T 1 This is an interlocutory appeal from the denial of a defense motion for summary judgment. Plaintiffs alleged negligence in the hiring, training, and supervision of defendants' employees resulting in the sexual assault of A.R. (a minor child) by defendants' employee Matthew Cooper. The assault took place in a home occupied by disabled individuals who were living under defendants' care. Defendants moved for summary judgment on the grounds that they owed no duty of care to A.R. and that plaintiffs had failed to establish a standard of care through expert testimony. In a subsequent motion, defendants also asserted that in any event they were entitled to apportion liability to their employee under the comparative fault provisions of Utah Code section 78B-5-818. The district court denied defendants' motions, and we granted their petition for interlocutory appeal.
2 We affirm in part and reverse in part. First, we affirm the decision holding that defendants owed a duty to A.R. to exercise reasonable care in the hiring, training, and *622 supervision of their employees. We do so on the basis of a special relationship that we find to have been established under the terms of the Restatement (Second) of Torts section 317. Second, we uphold the district court's determination that plaintiffs had no obligation to designate an expert witness to establish a standard of care. Finally, we reverse the district court's decision regarding apportionment, holding that the "fault" to be apportioned under Utah Code section 78B-5-818 is not limited to negligence but extends to intentional torts. On that point, we resolve a question identified in our past cases but never previously commanding a majority. See Field v. Boyer Co., 952 P.2d 1078, 1080 (Utah 1998) (Zimmerman, C.J., plurality opinion}.
I
13 Defendants North Eastern Services-Lakeside, Inc. and North Eastern Services, Inc. (NES[1]) provide services for individuals with mental and physical disabilities NES's services are provided under contracts with the State of Utah, monitored by the State Department of Human Services. NES employees provide various levels of supervision, depending on the needs of the client as determined by the client's "action plan."
T4 Some NES homes are in residential neighborhoods. Typically such homes are occupied by three or fewer residents. Some of NES's action plans include goals for residents to interact with children, on the rationale that such interactions may be beneficial to the residents.
1 5 The sexual assault on A.R. occurred in a duplex referred to by NES as "Res 7." The Res 7 duplex was in Logan, in a complex surrounding a central parking lot and play area. According to the record on summary judgment, the main door to Res 7 was often left open during the summer, allowing children to come in or out as they pleased.
T6 There was also evidence of certain features that may have attracted children to approach and enter Res 7. For one thing, one of the residents of Res 7 was known for having candy on hand in his room. When neighborhood children asked about candy, NES staff would sometimes retrieve it for them from that client's room. Alternatively, he or the staff would sometimes invite the children into Res 7 to find the candy.
17 The record also indicated that NES staff had maintained a portable swimming pool outside the open door to Res 7. The principal purpose of the pool was for the benefit of the other resident of Res 7 (a second NES client whose action plan required NES monitoring "at all times" when near children). The second client used the pool to soak his feet. Neighborhood children often used it to play in during the summer.
T8 The other attraction in Res 7 was a television. According to the record, neighborhood children often entered the residence to watch television or videos with the residents and/or NES staff.
T9 A.R. was sexually abused by NES employee Cooper on July 18, 2008. On that day AR. was playing in the common area outside of Res. 7, asked for some candy, and was invited into the residence to watch television with Cooper and one of the residents. Cooper eventually escorted AR. into the bathroom, where he sexually assaulted her.
110 Cooper was under the supervision of NES employee Amber Brady at the time of the assault. Brady testified that she had a "bad feeling" when she saw Cooper show AR. where the bathroom was, but proceeded with cleaning and vacuuming instead -of intervening. She also indicated that when she went to put the vacuum away she saw Cooper and A.R. exiting the bathroom and "had such an awful feeling" when she noticed that AR. had a "red face" and appeared to have been erying. At that point Brady asked A.R. what was wrong. AR. responded inaudibly, and Cooper then answered for her, indicating that she "missed her home and wanted to go home."
*623 111 Brady then called her supervisor and ultimately the police. Cooper was arrested and charged with aggravated sexual abuse of a child. He subsequently entered a guilty plea, and is now serving a sentence of fifteen years to life in prison.
{ 12 NES's actions in hiring and supervising Cooper were of central concern on summary judgment. The evidence established that Michelle Grajeda was the person responsible for interviewing Cooper and checking his references. Yet although Cooper had been terminated from a recent job in the same field for sexually abusive conduct, Grajeda apparently never asked about his previous employment, indicating that she had never been trained to ask such questions. As for checking references, Grajeda testified that she had no memory of calling Cooper's previous employer(s), but believes that she would have done so per her past practice. Plaintiffs, on the other hand, presented evidence that Cooper's prior employer, Lindon Care, had terminated. Cooper for sexually abusive actions against a client, had concluded that Cooper was not qualified to work in the field, and alleged that it had "no record of any phone calls received from any representative of [NES] regarding Mr. Cooper's employment with Lindon Care." As for training, the summary judgment record indicated that Brady had not received training on children in NES homes or on how to keep children safe.
{13 Plaintiffs Rachel Graves and Dustin Russell, A.R.'s parents, filed this negligence action on her behalf in the First District Court. Initially the complaint asserted claims only against Cooper. Plaintiffs subsequently amended the complaint to add claims against the NES defendants, including claims for negligence in hiring, training, and supervising its employees.
{14 NES eventually filed a motion for summary judgment, The motion asserted two grounds for dismissal of plaintiffs' claims for negligence: (a) that NES owed no duty to A.R., a guest in the home of NES's clients, in its hiring, training, and supervision of employees; and (b) that plaintiffs had failed to establish a standard of care through expert testimony, thereby leaving the jury to speculate as to what NES was reasonably required to do under the circumstances of the case.
1 15 Soon after the filing of the NES tion, plaintiffs sought voluntary dismissal of their claims against Cooper. NES filed a notice asserting its intention to seek apportionment of comparative fault of Cooper under Utah Code section 78B-5-818.
116 The district court denied NES's motion for summary judgment on the negli-genee claims. It also approved dismissal of Cooper as a defendant and ruled that apportionment as to his intentional conduct was improper under section 78B-5-818 (while approving a jury instruction explaining his role in the case).
T17 We granted NES's petition for interlocutory appeal. We now review the district court's decisions-on summary judgment, and on issues of law-de novo, affording no deference to its determination of the matters on appeal. Bahr v. Imus, 2011 UT 19, ¶ 15, 250 P.3d 56.
II
1 18 We affirm the denial of NES's motion for summary judgment, concluding that NES owed a duty to A.R. and that plaintiffs had no obligation to present expert testimony in support of a standard of care. We reverse as: to the district court's determination regarding apportionment, however. On this issue, we hold that the text of the apportionment statute broadly authorizing apportionment for any and all "fault"-expressly defined to encompass "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury," Uran Cop® § 78B-5-817, encompasses not just negligence but also intentional acts.
A. Duty
{19 We recently clarified and extended the paradigm for analyzing questions of duty in tort in our opinion in B.R. ex rel. Jeffs v. West, 2012 UT 11, 275 P.3d 228. In that case we reaffirmed the core tort-law distinction between misfeasance (active misconduct) and nonfeasanee (omissions). Id. ¶ 17. Specifically, we noted that we all generally have a duty *624 of due care in the performance of our affirmative acts, but that a duty regarding non-feasance typically inheres only in "special legal relationships." Id.; see also Webb v. Univ. of Utah, 2005 UT 80, ¶ 10, 125 P.3d 906 ("In almost every instance, an act carries with it a potential duty and resulting legal accountability for that act. By contrast, an omission or failure to act can generally give rise to liability only in the presence of some external cireumstance-a special relationship."), overruled on other grounds in Cope v. Utah Valley State College, 2014 UT 58, ¶ 27, 342 P.3d 243.
€20 Thus, a key threshold question regarding duty is whether the plaintiffs harm is alleged to have been caused by (a) an affirmative act of the defendant or (b) an act of a third party that the defendant failed to prevent. In the former case a tort-law duty is the general rule. But in the latter case the general rule is the contrary. A person generally has "no duty to control the conduct of third persons." Higgins v. Salt Lake Cnty., 855 P.2d 231, 236 (Utah 1993) (citing RrstatEmEnt (SEconp) or Torts § 315 (1965)). This general rule, of course, is subject to a significant exception-under the above-noted "special relationship" principle. Id.; see also Rollins v. Petersen, 818 P.2d 1156, 1159 (Utah 1991) (acknowledging the general rule and the special relationship exception).
{ 21 In explaining these principles in Rollins, we "acknowledge{[d] the general applicability in Utah of the 'special relation' analysis described in sections 314 through 8320 of the Restatement of Torts." 813 P.2d at 1159. The issue in Rollins was whether a secure mental health facility owed a duty to prevent 'a patient from leaving the facility and causing a car accident. Id. at 1158. In declining to find such a duty, we first invoked the standard set forth in section 815 of the see-ond Restatement-that
[tlhere is no duty so to control the conduct of a third person to prevent him [or herl from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.
Id. at 1159, n. 1 (second alteration in original) (quoting Restatement (SEconp) or Torts § 315). Next, we noted that the "two exceptions" set forth in section 815 "are given more detailed explanation" in subsequent sections. Id. at 1159. Of particular relevance in Rollins was section 819, which provides that " '[oJne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing 'such harm." Id. (quoting RestarEmEnt (SEconp) or Torts § 819).
122 Our holding in Rollins was to decline to find a special relationship between the mental health facility and the plaintiff's decedent. We based that decision on a limiting construction of section 819-that "the 'others' to whom ... bodily harm is likely' and in favor of whom the duty arises must be reasonably identifiable by the custodian either individually or as members of a distinet group." Id. at 1162. And because the plaintiff's decedent was not reasonably identifiable, we held that the "hospital owed no duty." Id.
123 The parties in this case have staked out contrary positions under the above framework. Because the assault on A.R. was perpetrated by a third party (Cooper), NES frames the case as one involving only its nonfeasance-in not undertaking acts (supervision, training, and employment background checks) to prevent the assault. And because the assault was outside the seope of Cooper's employment, NES insists that it bears no responsibility for the acts of its employee.
1 24 Plaintiffs frame the case quite differently. They first portray NES's responsibility in terms of affirmative acts of misfeasance, noting that NES affirmatively enticed children like AR: into Res. 7, in a manner leading to the assault. Alternatively, plaintiffs contend that this case does involve a special relationship-arising under the Restatement (Second) of Torts section 317. That section of the restatement provides as follows:
*625 A master is under a duty to exercise reasonable care so to control his servant while acting outside the seope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(1) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(Mis using a chattel of the master, and
(b) the master |
(i) knows or has reason to know that he has the ability to control his servant, and
(i) knows or should know of the necessity and opportunity for exercising such control.
REstatEMENT (SEcond) or Torts § 317.
1[ 25 We endorse NES's view of the case on the misfeasance / nonfeasance front, but accept plaintiffs' basis for a special relationship. Thus, we conclude that the essence of plaintiffs claim is in asserting the unreasonableness of NES's failure to prevent the assault perpetrated by a third party, but we adopt the principle set forth in section 317 of the second restatement and find its standards satisfied here.
1. Misfeasance / Nonfeasance
126 As plaintiffs have noted, their claims implicate some affirmative acts attributable to NES-in enticing children like AR. into Res. 7 by keeping the door open, maintaining a portable swimming pool outside, and offering candy and television inside. And those acts are plausibly connected to the assault on A.R. Thus, to the extent plaintiffs are complaining about these affirmative acts, NES would have a duty to perform them in a non-negligent, reasonable manner.
1[ 27 That is ultimately an inadequate basis for a finding of duty here, however. The crux of plaintiffs' case is not that NES was uncareful in the way it placed the portable swimming pool, or in the manner in which it offered candy or television programming. Instead, plaintiffs' core complaint is with NES's omissions or failures-in not performing an employment background check on Cooper, and in not providing training and supervision for Brady and Cooper. Those omissions, moreover, were significant in their failure to prevent a tortious act of a third party (Cooper). So a decision upholding a duty by NES to perform its affirmative acts in a reasonable manner would not get the plaintiffs very far. It would leave room for them to charge negligence in the placement of the swimming pool or in offering candy or television, but not to assert their core claim for negligent hiring, training, and supervision.
1128 The point is related to one we made recently in Hill v. Superior Property Management Services, Inc., 2013 UT 60, 321 P.3d 1054. In Hill the question was whether an entity hired to mow the lawn at an apartment complex owed a duty to apartment residents to prevent the hazard associated with offshoots of tree roots growing hidden in the grass. Id. T1. As one of several grounds for such a duty, plaintiffs in Hill asserted that the property management company had voluntarily undertaken the affirmative act of mowing the lawn, and claimed that that undertaking sustained a duty under the Restatement (Second) of Torts section 328. Id. 138. We rejected that ground for a duty, noting that plaintiffs had "failled] to connect up any activity that [defendant] voluntarily undertook with an allegation of negligence in the performance of that activity." Id. 189. In other words, because "the only specific voluntary undertaking" identified by plaintiffs in Hill was mowing, and plaintiffs conceded that "the tree shoot hazard could not be remedied by mere mowing," we noted in Hill that plaintiffs' real claim was that the injury "could have been prevented if [defendant] had chosen to undertake additional activities." Id. ¶¶ 39-41. And we held that defendant's duty "was limited to the extent of its undertaking," not "a basis for a general obligation to undertake affirmative acts in aid of third parties." Id. ¶ 41.
T29 A similar approach is in order here. NES's affirmative acts are a basis for imposing a duty in the performance of those acts, not for a broader duty to undertake additional measures aimed at preventing the sexual assault by a third party. And because plain *626 tiffs' claims seem aimed at NES's failures (as regards training, supervision, and employment background checks), and not its affirmative acts, we must proceed to consider the question whether there is a special relationship here sustaining such a duty.
2. Restatement (Second) section 817
130 NES questions the basis for any such relationship here by asserting that Cooper's sexual assault on A.R. was outside the scope of his employment. Citing Birkner v. Salt Lake County, 771 P.2d 1053, 1056-57 (Utah 1989), NES asserts that an "unprovoked, highly unusual, and quite outrageous" act undertaken for "purely personal motives" is beyond the seope of employment. And on that basis NES insists that it "had no special relationship to A.R. who was harmed by the independent conduct of NES's employee Cooper when he criminally acted outside the seope of his employment."
1 31 NES's argument misses a key distinction between vicarious and direct liability. The scope of employment question concerns a principle of agency law, of relevance to the question of an employer's vicarious liability. But the question presented here is one of direct liability-of whether NES can be liable directly (for its own negligence) for harm to a guest resulting from negligence in hiring, training, or supervision.
1 32 The answer to that question depends on whether there is a basis for finding a special relationship sustaining a duty in the cireumstances of this case. We find such a basis in the principle set forth in section 817 of the Restatement (Second) of Torts. Our caselaw has not previously endorsed this standard directly. But we have cited favorably to the "special relation[ship]" principles in "sections 314 through 320 of the Restatement of Torts." Rollins, 813 P.2d at 1159. And we find the standard in section 817 eminently reasonable, while noting that it has been widely endorsed throughout the United States and rarely, if ever, criticized.[2]
183 Section 317 recognizes a "special relationship" basis for a duty of an employer to exercise reasonable care in preventing an employee from acting outside the seope of employment in "intentionally harming others." REstatemMENt (SEconp) or Torts § 317. NES challenges the wisdom of a duty that it views as fundamentally altering the "employment landscape in Utah," in a manner opening up "liability never before anticipated," turning "theories of seope of employment and respondeat superior ... on their heads." Specifically, NES questions the prudence of a principle that would render employers insurers against criminal activity perpetrated on their premises, warning that under this standard "every employer who runs a business that ever has children present" would face liability whenever "an employee harms those kids, regardless of how independent or intentional the action is."
1 34 For the most part, NES's opposition is mistaken and misdirected-aimed at a strawman, and not at the section 317 standard that we adopt today. First, as already noted, the duty at stake under section 317 sounds in direct-not viearious-liability. So *627 the standard we adopt makes no employer an insurer and in no way undereuts the vicarious liability principle of respondeat superior. This is about an employer's duty with respect to its own negligence, not its secondary liability for someone else's.
135 Second, the standard in section 317 does not impose liability on "every employer who runs a business that ever has children present." Instead, as quoted above the duty standard we adopt requires proof (a) that the employee who intentionally harms another is on premises he is entitled to enter only by virtue of his status as an employee, and (b) that the employer knows or has reason to know that he has the ability to control the employee and knows or should know of the necessity and opportunity for exercising such control. Id. Perhaps this standard would not be satisfied in cireum-stances where the employer's business does not foreseeably put its workers in contact with the public, since in that case the employer might not know of the necessity and opportunity for exercising control. But this is not such a case. Here it is more than foreseeable that NES's workers will come into contact with the public, including children like AR. As noted above, NES affirmatively went out of its way to encourage the involvement of neighbors in the goings-on in Res. 7. It is hardly in a position to question the basis for its knowledge of the necessity of controlling its employees in their interactions with the public.
T36 Thus, we hereby adopt the standard set forth in section 317 of the second Restatement. And because its elements are satisfied under the undisputed facts of this case, we affirm the district court's decision denying NES's motion for summary judgment on the question of duty.
B. Standard of Care
137 The standard of care in a negligence action is generally a question of fact for the jury. The jury's determination, moreover, is a matter for the commonsense assessment of a lay juror-not for expert testimony. This follows logically from the premise of the standard of care in tort. Because the essential question is the care that a reasonable person would undertake in the defendant's cireumstances, we generally leave it to Jurors-as ordinary persons representing a particular community-to make that judgment. See Pearce v. Utah Athletic Found., 2008 UT 18, ¶¶ 25-26, 179 P.3d 760.
1388 Our cases recognize a limited exception to this general rule. In medical malpractice cases, we have generally required expert testimony regarding the standard of care. See Bowman v. Kalm, 2008 UT 9, ¶ 7, 179 P.3d 754. The rationale is rooted in an intuitive exception to the above-noted rule-that unlike the run-of-the-mill negligence case, "most medical malpractice cases 'depend upon knowledge of the scientific effect of medicine, " a matter "not within the common knowledge of the lay juror." Id. (quoting Fredrickson v. Maw, 119 Utah 385, 227 P.2d 772, 778 (1951)).
139 The medical malpractice exception itself is subject to a further exception. Under the "common knowledge" exception, expert testimony is not required-and the matter is left up to the jury's lay assessment-in cases where the standard of care could be assessed according to lay common knowledge. Id. ¶¶ 9-10. Thus, where a "medical procedure is so common or the outcome so affronts our notions of medical pro-pricty" that scientific knowledge is not necessary, "the plaintiff can rely on the common knowledge and understanding of laymen to establish this element." Nixdorf v. Hicken, 612 P.2d 348, 353 (Utah 1980).
$40 Ultimately, then, the question of the need for expert testimony turns on the nature of the standard to be addressed by the jury. Questions of ordinary negligence are properly determined by the lay juror without the need for expert testimony. Where the standard implicates scientific matters beyond the capacity of an ordinary juror, however, expert testimony may be required. See Jenkins v. Jordan Valley Water Conservancy Dist., 2018 UT 59, ¶¶ 11, 16-17, 321 P.3d 1049 (holding that expert testimony was required on the question whether a cast-iron pipeline needed to be replaced, given that analysis of that question was "not within the knowledge and experience of average lay *628 persons," but would depend on esoteric questions "such as soil conditions, burial depth, and the extent of any earth movement in the area").
141 We see no basis for requiring expert testimony regarding the standard of care in this case. 'The question of what a reasonable person would do in performing background checks .in hiring and in training and supervising employees is one permissibly resolved on the basis of the knowledge and experience of lay persons. NES has cited no cases, and we are aware of none, requiring expert testimony on such matters.
142 The case NES does cite, Collins v. Utah State Developmental Center, 1999 UT App 336, 992 P.2d 492, clearly cuts the other way. In Collins, the staff of a group home allowed a mentally handicapped woman to use a swing set, resulting in severe injury. Id. T8. The issue in the ensuing litigation concerned the need for expert testimony regarding the reasonable care required of a group home in this cireumstance. See id. 116-8. The Collins court concluded that this case was different from the medical malpractice context, where "the nature of the profession removes the particularities of its practice from the knowledge and understanding of the average citizen." Id. 17 (internal quotation marks omitted). Instead, the court of appeals held that this fell within the Niz-dorf "common-knowledge" exception, as "a lay juror can readily evaluate the alleged negligence by the Center in failing to protect Collins from a swing injury." Id. 18.
4 43 The Collins court relied on a case that is even closer to the fact pattern at hand, Virginia S. v. Salt Lake Care Center, 741 P.2d 969 (Utah Ct.App.1987). In that case the court of appeals concluded that "where a mentally and physically incapacitated seventeen-year-old girl was raped while under the care and custody of the defendant nursing home, there are no medical technicalities involved that call for expert testimony to determine whether the nursing home breached its standard of care." Id. at 972. This case is parallel to Collins and Virginia S. The matters at issue appear to us to sound in common sense, not science or other subjects of expertise. We accordingly see no basis for requiring plaintiffs to present expert testimony on the standard of care, and affirm the denial of summary judgment on this question as well.
C. Allocation of Liability
1I 44 Decades ago our legislature abrogated the common law doctrine of contributory negligence. In the 1978 Comparative Negli-genee Act, the legislature replaced this common law defense with a comparative negligence regime. 1973 Utah Laws 710-12. The 1978 act was subsequently revised and extended by the Liability Reform Act of 1986, which maintained the comparative liability regime while extending its scope. 1986 Utah Laws 470.
45 Although the governing statutory regime has been in place for decades, this court has not yet had occasion to make a definitive pronouncement on the question presented by this case-whether our comparative negli-genee regime provides for allocation of responsibility for intentionally tortious conduct. Various members of the court have opined on the issue in separate opinions. See Field v. Boyer Co., 952 P.2d 1078, 1080 (Utah 1998) (Zimmerman, C.J., plurality opinion) (concluding that "an intentional tort such as battery is an act that proximately causes or contributes to injury or damage," and thus that "the legislature included intentional acts in its comparative fault scheme"); id. at 1088 (Stewart, J., concurring in part, dissenting in part, joined by Durham, J.) ("The Legislature never intended such an absurd result."). But we have not as yet resolved the matter, as the Field case was decided on other grounds, and no majority view was announced on the question before us.
146 We now interpret our statutory comparative liability regime to call for apportionment of responsibility for intentional torts. That conclusion appears to us to follow from the broad, categorical terms of the Liability Reform Act, as informed by the history and evolution of our statutory scheme. In so holding, we recognize that the statute arguably leaves room for doubt on this question, and of course acknowledge the legislature's prerogative to override our deci *629 sion or to clarify its intent if we have misper-ceived it. Thus, we highlight some of the competing policy considerations at stake as we see them, in a manner that may be useful to the legislature if it decides to revisit this important issue. ©
1. Fault
47 The apportionment provision of our code calls for the court to "allocate the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person identified under Subsection T8B-5-821(4) for whom there is a factual and legal basis to allocate fault." Utax CopE § 78B-5-818(4)(a) Matthew Cooper is a person who qualifies for apportionment under the terms of Utah Code section 78B-5-821(4), as NES filed the description of the factual and legal basis for apportionment called for under that section. Thus, the sole question on appeal is whether Cooper is one with a "percentage or proportion of fault attributable" to him.
48 That question turns on the statutory definition of "fault." The term is expressly defined in the Liability Reform Act. Under Utah Code section 78B-5-817(2),
"Fault" means any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all its degrees, comparative negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products lability, and misuse, modification, or abuse of a product.
49 We interpret this definition to encompass intentionally tortious activity. The core definition is broad and categorical. It extends to "any actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages." Thus, the key limiting term of the definition is the element of causation. Any breach of duty, act, or omission counts as fault so long as it is proximately connected to injury or damages.
50 The parties' briefs focus on the question whether an intentional tort amounts to a breach of duty. We think that it does, as our caselaw has long defined "duty" in tort to encompass any "obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another," Jeffs, 2012 UT 11, ¶ 5, 275 P.3d 228 (internal quotation marks omitted), and everyone has a legal obligation to refrain from committing intentional torts.
4 51 That said, the statutory question presented does not require an answer to the "duty" question, as apportionment is called for under the statute not just for breaches of duty but for any act or omission that proximately causes or contributes to injury or damages. And because there is no tenable notion of "act" that does not extend to an intentional tort, we read the text of our statute to call for apportionment for torts like Matthew Cooper's sexual assault.[3]
*630 € 52 This construction is confirmed by the structure and context of this provision. First, the statutory definition of fault is written in terms encompassing any act proximately causing injury. The term any is broadening and inclusive. It is defined as "every; all," WesstEr's THirp NEw INTERNATIONAL Dictionary 97 (2002), or "one or more without specification or identification." Ran-pom House Dictionary or THs EncuisH Lan-cuacE 96 (2d ed.1987). That construction of any is more than just the ordinary sense of the word as found in the dictionary. It is the sense of the word given in extensive judicial constructions of a broad range of statutory provisions, which consistently recognize the broad, encompassing import of this term.[4] We cannot interpret the statutory definition of fault to exelude intentional torts without robbing the term any of its clear import. And that, of course, would run counter to our sensible, longstanding canon of preserving meaning for each provision of the statutory text. State v. Arave, 2011 UT 84, ¶ 28, 268 P.3d 163 ("It is our duty to give effect, if possible, to every word of [a] statute." (alteration in original) (internal quotation marks omitted)).
53 The second point confirming our construction is that the list of actions included within the definition of fault is introduced by the word "including." This renders the absence of any specific reference to intentional torts inconsequential. Like any, including is an established term of art with an established meaning. Brack's Law DICTIONARY 831 (Oth ed.2009) typically indicates a partial list."). In statutory cases far and wide, this term is routinely construed as introducing a non-exclusive, exemplary list.[5] And that is of course the obvious, ordinary sense of the word. To include is to embody or encompass; exclude, of course, is an antonym. Raxnpom House Dictionary OF THE EncuIsH LancguacE 967 (defining "include" as "to place in an aggregate, class, category, or the like" and listing "exclude" as an antonym); WeestEr's THirp NEw INTERNATIONAL DIcrionNARYy 1148 (defining include as "to place, list, or rate as part or component of a whole or of a larger group, class or aggregate"). So the only way to read the list of examples of acts amounting to fault is as a non-exhaustive list.
154 A 1994 amendment to the statute omitted an additional phrase-'"not limited to." 1994 Utah Laws 1022. Thus, prior to the amendment the statutory definition of fault introduced the listed examples with the phrase "including but not limited to." Id.
*631 Perhaps the "not limited to" phrasing made the non-exhaustive nature of the list even clearer. But we see no basis for the conclusion that the omission of "not limited to" somehow indicates that "[cllearly the Legislature intended to limit comparative fault principles to the types of claims and defenses specified in the statute." Field, 952 P.2d at 1087 (Stewart, J., concurring in part, dissenting in part). That is hardly clear. The omission of "not limited to" could just as easily indicate a move-quite common in legislative amendments-to omit unnecessary surplusage.[6] And in light of the widely accepted meaning of "including" in this context, that is the way we interpret the 1994 amendment. There are ample-abundantly clear-indications of the non-exhaustive nature of the statutory list of illustrative examples even without the "not limited to" phrase. So there is no basis for crediting the 1994 amendment as accomplishing anything more than clearing away surplusage, and that is the way we understand it.[7]
2. Counterarguments
T55 The above analysis forecloses plaintiffs' invocation of the ejusdem generis canon of construction. That canon, as plaintiffs note, provides that an ambiguity regarding a general term following or followed by an "inexhaustive enumeration of particular or specific terms" may be resolved by interpreting the general term to be "restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent." State ex rel. A.T., 2001 UT 82, ¶ 12, 34 P.3d 228. But the canon comes into play only in cases of ambiguity as to the meaning or scope of the general term. Great Salt Lake Auth. v. Island Ranching Co., 18 Utah 2d 45, 414 P.2d 963, 966 (1966) ("'The rules of statutory construction ... were developed to aid in determining the intent of legislation where meaning is obscure or uncertain and not to destroy that which is clearly apparent."). Where the general term unambiguously exceeds the seope of a non-exhaustive list, we cannot read the list to override the clear meaning of the general term.
156 That conclusion likewise forecloses any significance of the title of section 7TSB-5-818. See Field, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) ("Significantly, the title of [the Act] ... is 'Comparative negligence'"). The title makes express reference to "Comparative Negligence." See Utax Cope § 78B-5-818. And it is true that we have, on occasion, afforded some clarifying significance to titles of statutory enactments or provisions. E.g., Blaisdell v. Dentrix Dental Sys., Inc., 2012 UT 37, ¶ 10, 284 P.3d 616. But we have also held that "[the title of a statute is not part of the text of a statute, and absent ambiguity, it is generally not used to determine a statute's intent." Id. (internal quotation marks omitted); see also Funk v. Utah State Tax Comm'n, 839 P.2d 818, 820 (Utah 1992) (declining to interpret a statute to be consistent with its title when the title "is clearly narrower than the plain language of the statute"). So where, as here, the statute's terms are broad and encompassing, extending beyond the title assigned to the provision in question, it is the statute's text that controls, and not its title.
T57 In this case, moreover, there is a simple explanation-evident in the historical evolution of our statutory scheme-for the section title's reference to comparative negligence. The first statutory iteration of our comparative liability regime, the 1973 Comparative Liability Act, dealt exclusively with negligence. It provided that a plaintiffs "[clontributory negligence shall not bar recovery" in' a negligence action, so long as *632 "such negligence was not as great as the negligence or gross negligence" of the defendant. Uran Copr $ 78-27-37 (1978). It also indicated that the plain-tiff's damages were to be "diminished in the proportion to the amount of negligence attributable to" the plaintiff. Id. And the court was to "direct the jury to find separate special verdicts determining (1) the total amount of damages suffered and (2) the percentage of negligence of the damages in proportion to the amount of negligence attributable to the person seeking recovery." Id. § 78-27-38. That provision is the direct antecedent to the one at issue here. Both provisions are phrased in similar terms-of requiring the court to direct the jury to apportion liability.
158 It is hardly surprising, therefore, that the provision at issue here is titled "Comparative Negligence." That was its sole original focus. And even today, that is perhaps its principal application. We cannot from that premise proceed to conclude that the 1986 Liability Reform Act "did not alter the basic principles of comparative negligence contained in the 1978 Act," or that the amended provision "did not ... include any claims for relief that involved an intent or purpose to harm." Field, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part).
59 The 1986 amendments most certainly did alter the principles of comparative negli-genee in the 1978 Act. They did so first by abrogating the doctrine of joint and several liability, which had persisted under the 1973 Act. Compare 1978 Utah Laws 710 ("The right of contribution shall exist among joint tortfeasors," with "each remaining severally liable to the injured person for the whole injury as at common law."), with 1986 Utah Laws 471 ("No defendant is entitled to contribution from any other person."). More significantly, the 1986 amendments replaced the concept of apportionment of comparative "negligence" with the operative principle of apportionment of comparative "fault." Compare 1978 Utah Laws 710 ("Contributory negligence shall not bar recovery. ..."), with 1986 Utah Laws 471 ("The fault of a person seeking recover shall not alone bar recovery...."). And of course the 1986 amendments adopted a definition of "fault" that broadly extends beyond mere principles of negligence. -It is thus impossible to read the 1986 Act as merely retaining-and not altering-the basic principles of comparative negligence in the 1978 Act.
1 60 Granted, the 1986 Act "broaden{s] the statute to apply comparative principles in products liability and breach of warranty cases so that defenses such as misuse, abuse of product modification, etc., were no longer absolute bars to recovery but operated only to reduce a plaintiff's recovery." Field, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) (characterizing 1986 Act as "reflect[ing] the abolition of absolute defenses and the adoption of comparative negligence principles" in products liability cases under cireumstances like those in Mulherin v. Ingersoll-Rand Co., 628 P.2d 1301 (Utah 1981)). But it would be an oversimplification to read the 1986 amendments as doing no more than that. That conclusion would overlook the impact of the legislative decision to replace a narrow principle of apportionment of comparative "negligence" with a broad concept of apportionment of comparative "fault."
T 61 This court's opinion in the Mulhkerin case puts the 1986 amendments in perspective. That case involved "jury findings of concurrent proximate causes of ... infury"-of a "defective condition" of a product and of "plaintiff's misuse" of it. 628 P.2d at 1303. Our opinion concluded that the 1973 Act did not apply, as its principles of comparative fault extended only to actions " 'to recover damages for negligence or gross negli-genee,' " and products lability did not technically implicate negligence. Id. (quoting Urah Cope § 78-27-87 (1978)). At the same time, the Mulherin court nonetheless adopted a common law rule under which "both faults should be considered by the trier of fact in determining the relative burden each should bear for the injury they have caused." Id. (adopting rule under which plaintiff's recovery is limited to "that portion of his damages equal to the percentage of the cause contributed by the product defect" (internal quotation marks omitted)). And in so holding, our court emphasized that the term "fault" in play was "not synonymous with *633 'negligence,' but instead connote[d] responsibility." Id. at 1808 n. 7 (citing John W. Wade, Products Liability and Plaintiffs Foult-The Uniform Comparative Fault Act, 29 Mercer L. Rev. 878, 376 (1978) (arguing that negligence-based fault and strict liability "tend to fade into each other and are not utterly different in kind")). Thus, while acknowledging "semantic difficulties in comparing strict liability and negligence," we indicated our confidence "that judges and juries [would] have no difficulty assigning the relative responsibility each is to bear for particular injury when the ultimate issues in such comparison are relative fault and relative causation." Id. at 1304.
T62 The 1986 Act adopted the essential principles of the Mulkerin court's analysis. It defined "fault" in a manner that was "not synonymous with 'negligence, but instead connote[d] responsibility." Id. at 1303, n. 7; see Utan § 78B-5-817(2) (defining "fault" as "any actionable breach of legal duty, act, or omission proximately causing or contributing to injury"). And it shifted the foeus from apportionment 'of comparative negligence to the task of "assigning the relative responsibility" based on "relative fault and relative causation." Id. at 1304.
1 63 Plaintiffs' construction of the 1986 Act robs the statute's text of its plain meaning. It shifts the focus back to the 1978-era notion of comparative negligence and away from relative fault and causation. We cannot adopt that reading without overriding the clear import of the statutory text.
1 64 Nor can we credit statements in the 1986 Act's legislative history, cited by both the plaintiffs and the dissent, as sustaining the conclusion that our eurrent statute is still merely " 'a comparative negligence statute.'" Field, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) (quoting Floor Debate S.B. 64, Utah Senate, 46th Leg.1986, General Sess., Senate Day 31, Records No. 638 (Feb. 12, 1986)); see also infra 188. The statutory text extends well beyond comparative negligence. Such extension, in fact, was the whole point of the 1986 amendments. We cannot properly invoke the legislative history in a manner overriding the terms of the statute. Legislative history is not law. It may be useful in informing our construction of ambiguities in the law. But its utility ends there. See Hooban v. Unicity Int'l, Inc., 2012 UT 40, ¶ 17, 285 P.3d 766 (holding that "the statute's language marks its reach," and refusing to allow the legislative history to "supplant" the statutory text).
T 65 The cited legislative history suggests that individual legislators and their counsel may have understood the statutory definition of "fault" as synonymous with "negligence." See Field, 952 P.2d at 1086 (Stewart, J., concurring in part, dissenting in part) (citing statements of Senator Lyle Hillyard and attorney Steve Mecham, both of whom equated "fault" with "negligence"). And perhaps those statements could be accepted as indicating the typical reach of the statute-as explaining that a common application of fault is negligence. But they cannot properly be read to define the full breadth of the statute's seope. That would give primacy to legislative history, and only secondary significance to the duly enacted statute. And it would thereby turn a core principle of statutory construction on its head.
{66 The dissent chides us for extending fault allocation "to hitherto unknown territory" that it sees as incompatible with the legislature's "purpose." Infra ¶ 82. In the dissent's view, "[t]he purpose of the Comparative Negligence Act was to ameliorate the harsh common law rules that made contribu«tory negligence, no matter how slight, an absolute defense to an action by a plaintiff for negligence and barred all recovery." Infra ¶ 82 (internal quotation marks omitted). And the dissent would have us limit our understanding of the statute to that purpose, in a manner foreclosing its application to intentional torts.
167 We disagree on two grounds. First, as our recent decisions have emphasized, the governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process of bicameralism and presentment.[8] We may resolve ambiguities *634 in the text of the law by reference to reliable indications of legislative understanding or intent (as in legislative history). But the invocation of extra-statutory intent as a matter overriding the statutory text gets things backwards. The statutory language is primary; legislative history is of secondary significance.[9]
"I 68 Second, the dissent's position is based on an erroneous premise-that statutory provisions are addressed only to the specific problems giving rise to their adoption. Our recent cases again have repudiated this principle. We have explained that "we cannot presume that the legislature meant only to deal with [one] particular problem, as legislative bodies often start with one problem in mind but then reach more broadly in their ultimate enactment." Hooban, 2012 UT 40, ¶ 17, 285 P.3d 766. And we have therefore emphasized that "we cannot limit the reach of [a statute] to the ill that initially sparked [the legislature's] interest." Id.; see also Myers v. Myers, 2011 UT 65, ¶¶ 26-28, 266 P.3d 806 (rejecting the contention that because "the legislative debate was addressed mainly to the need to remove a loophole ... we ought to construe the amendment as aimed at that purpose alone").
3. Policy
69 Plaintiffs' position, while falling short under the governing text of the statute, is not without some basis in public policy. We acknowledge some sympathy for the notion that extending the principle of comparative fault to intentional torts may threaten to dampen incentives of a defendant who has a duty to undertake due care in preventing acts of intentional misconduct. Thus, in cases involving a duty to supervise or train employees in a manner that would mitigate the possibility of an intentional tort by another, we recognize that it may seem "unfair to allow [a defendant's] liability to a faultless, injured plaintiff to be reduced or even eliminated by the culpability of an intentional wrongdoer." Field, 952 P.2d at 1088 (Stewart, J., concurring in part, dissenting in part).
170 That said, the scope of our authority in this matter is limited. In the face of a detailed statutory scheme like the Liability Reform Act, our role as policymaker is preempted. We are relegated to the function of agent of the legislature-of interpreting the policy judgment that it reached, and not of imposing our own will through the exercise of our limited judicial power.
71 In any event, the policy question presented in this case is more nuanced -and substantially more difficult-than that posed above. First, it is an overstatement to suggest that extending comparative fault to intentional misconduct would "eliminate[ ]" the incentive for due care in a manner "eviscer-at[ing] defendants' duty to prevent" an intentional wrong. Id. It is impossible to argue with the proposition that "[iJntentional tor-tious conduct has always been deemed to be categorically different from nonintentional tortious conduct." Id. at 1088. But that does not render "absurd[ ]" any attempt to apportion relative fault. See id. at 1088 ("Comparing a defendant's negligence and a rapist's intentional tort results in an absurdity; it is a comparison of unlikes, of apples and oranges."). In a case like this one-where NES allegedly failed to avail itself of numerous opportunities for a clear chance of preventing a sexual assault by an employee *635 with an apparent history of such misconduct-a factfinder could easily apportion ample responsibility to the defendant's acts of negligence.[10] A jury might easily-and appropriately-be moved to cast significant blame on a defendant who fails to avail itself of such opportunities. And that prediction is validated in real-world examples.[11]
T 72 Second, a refusal to apportion liability for intentional torts would raise line-drawing problems of a different sort. Our comparative liability statute plainly calls for apportionment for a range of tortious activity-not just for simple negligence but also for gross negligence and even recklessness. UTAH CopE § 78B-5-817. A decision foreclosing apportionment for intentional acts would thus raise a significant line-drawing concern along this plane-of how to justify apportionment right up to the line of intent but not beyond it.
173 The fairness concerns regarding apportionment, in other words, cut two ways. There is a downside in allowing intentionally tortious conduct to cut off (or at least pare back) the incentive for due care in preventing it. But onee we have started down the path of apportionment, there is also a downside to apportioning for negligence, gross negli-genee, and even recklessness but not for intentional acts.
174 The dissent overlooks these nuances. Instead of acknowledging the policies supporting extension of the Liability Reform Act's apportionment principle to intentional torts, the dissent simply rehearses the above-noted countervailing concerns. Infra ¶ 86 (asserting that "allowing allocation of intentional tortfeasors could have the consequence of rendering the duty of reasonable care by others unenforceable"). And after articulating those policies and ignoring those that cut the other way, the dissent proceeds to espouse the "belief" that those concerns must represent the legislature's true "intent." In-fro 188. But that is not a matter of interpretation of the law. It is the assertion of a preferred policy position, cloaked in an assurance that such position (deemed reasonable *636 because it is the view of the judge) must also correspond to the intent of the legislature (a body also presumed reasonable).
175 That sort of search for legislative intent is perilous, for reasons articulated long ago:
[In many cases, it is difficult to discover the motives, which may have prompted those who drew up the text; but it is also dangerous to construe upon supposed motives, if they are not plainly expressed. Every one is apt to substitute what his motives would have been, or perhaps, unconsciously, to fashion the supposed motives according to his own interests and views of the case; and nothing is a more ready means to bend laws, charters, wills, treatises, & c., according to preconceived purposes, than by their construction upon supposed motives. To be brief, unless motives are expressed, it is exceedingly difficult to find them out, except by the text itself; they must form, therefore, in most cases, a subject to be found out by the text, not the ground on which we construe it.
Francs LiEsEr, Lecat anp Poutticar HErMENEUTICS, OR PRINCIPLES OF INTERPRETATION AND Consrrucrion in Law Anp Pouttics 127-28 (1889). We reject the dissent's invocation of policy on these grounds. Interpreting the text of the Liability Reform Act as we understand it, we conclude that the statutory principle of apportionment for "fault" extends to cases involving intentional torts.
T 76 In so doing, we need not take sides on the question of which set of policy concerns identified above may ultimately prove more weighty. Because we conclude that our legislature has spoken on this issue, we defer to its judgment and enforce its decision as we understand it. And we do so not based on any abstract notion of purpose or intent but based on the legislature's actual product-the statutory text. We highlight the above concerns, however, because the statutory question before us is difficult, and we deem the matter sufficiently significant that it might merit further attention in the legislature.

. We follow the parties' convention in their briefs on appeal of referring to the corporate defendants collectively as NES-noting, as do defendants in their brief, that North Eastern Services, Inc. asserts a lack of any connection to the events leading to the assault of A.R. and purports to reserve a separate defense on that basis.

. At least thirty-six state supreme courts have cited § 317 favorably, many explicitly adopting it. See e.g., Destefano v. Grabrian, 763 P.2d 275, 287-88 (Colo.1988) (en banc); Malicki v. Doe, 814 So.2d 347, 361 n. 14 (Fla.2002); Wong-Leong v. Hawaiian Indep. Refinery, Inc., 76 Hawai'i 433, 879 P.2d 538, 549-51 (1994); Hills v. Bridgeview Little League Ass'n, 195 Ill.2d 210, 253 Ill.Dec. 632, 745 NE.2d 1166, 1179-86 (2000); Gariup Const. Co. v. Foster, 519 N.E.2d 1224, 1228 (Ind.1988); Thies v. Cooper, 243 Kan. 149, 753 P.2d 1280, 1285 (1988); Grand Aerie Fraternal Order of Eagles v. Carneyhan, 169 S.W.3d 840, 850 (Ky.2005); Fortin v. Roman Catholic Bishop of Portland, 871 A.2d 1208, 1222 (Me.2005); Barclay v. Briscoe, 427 Md. 270, 47 A.3d 560, 575-76 (2012); Semrad v. Edina Realty, Inc., 493 N.W.2d 528, 534 (Minn.1992); Gibson v. Brewer, 952 S.W.2d 239, 248 (Mo.1997) (en banc); Everitt v. Gen. Elec. Co., 159 N.H. 232, 979 A.2d 760, 764-65 (2009); Nelson v. Gillette, 571 NW.2d 332, 340-41 (N.D.1997); Vance v. Consol. R. Corp., 73 Ohio St.3d 222, 652 N.E.2d 776, 790 (1995); Schovanec v. Archdiocese of Okla. City, 188 P.3d 158, 170-71 (Okla.2008); Dempsey v. Walso Bureau, Inc., 431 Pa. 562, 246 A.2d 418, 419-21 (1968); James v. Kelly Trucking Co., 377 S.C. 628, 661 S.E.2d 329, 330 (2008); Iverson v. NPC Intern., Inc., 801 N.W.2d 275, 281 (S.D.2011); Otis Eng'g Corp. v. Clark, 668 S.W.2d 307, 313 (Tex.1983); Bradley v. H.A. Manosh Corp., 157 Vt. 477, 601 A.2d 978, 981 (1991); Niece v. Elmview Grp. Home, 131 Wash.2d 39, 929 P.2d 420, 427 (1997) (en banc); Shafer v. TNT Well Serv. Inc., 285 P.3d 958, 966 (Wyo.2012).

. The dissent takes issue with this conclusion, asserting that the LRA's definition of fault "uses language traditionally associated with negligence" that cannot be read to extend to intentional torts. Infra 179. Specifically, the dissent contends that the words "proximately causing" and "contributing to" injury are "inapt for intentional torts." Infra 179. And although the statute defines "fault" broadly, the dissent insists that the legislature did not intend to enact a "sea change in fault allocation." Infra 180. Instead, the dissent suggests that "fault" was aimed only at avoiding the limitations of the term "negligence," in a manner encompassing "strict liability and products liability" but not intentional torts. Infra 180. We disagree.
First, the foreseeability aspect of proximate causation is frequently relaxed in the case of intentional torts, see W. Pace Kegton Et aL,, Prosser ANnp KeEton on Torts § 8, at 37 (5th ed.1984); id. § 43, at 293, but proximate cause is in no way an alien inquiry in the world of intentional torts. See, e.g., United Food & Commercial Workers Unions, Empr's Health & Welfare Fund v. Philip Morris, Inc., 223 F.3d 1271, 1273-74 (11th Cir.2000) (recognizing "that the requirements of proximate cause are relaxed-to some degree-in intentional tort cases" but concluding that "the usual common law rule [of proximate cause] still forbids claims like Plaintiff's, even where those claims are premised upon intentional torts"). Second, "fault" is broadly defined by statute to encompass "amy ... act[] or omission." Urax Cone § 78B-5-817(2). And because there is no way to interpret "any act' in a manner excluding intentional torts, we are bound by the terms of the statute regardless of our vague sense of the legislature's likely intentions. See infra ¶¶ 64-68, 74-76.

. See, e.g., Mass. v. E.P.A., 549 U.S. 497, 528-29, 127 S.Ct. 1438, 167 LEd.2d 248 (2007) ('The Clean Air Act's sweeping definition of 'air pollutant' includes 'any air pollution agent'.... On its face, the definition embraces all airborne compounds of whatever stripe, and underscores that intent through the repeated use of the word 'any.'"); Dep't of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 131, 122 S.Ct. 1230, 152 LEd.2d 258 (2002) (interpreting statutory language reading "any drug-related criminal activity" broadly because "the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind" internal quotation marks omitted); Garamendi v. Golden Eagle Ins. Co., 127 Cal.App.4th 480, 25 Cal.Rptr.3d 642, 646 (2005) ("[Eiven if silica is not one of the enumerated items listed in the policy definition of pollutants, that listing is not exclusive and silica dust nonetheless comes within the broad definition of 'any solid, liquid, gaseous, or thermal irritant or contaminant.'"); W. Sur. Co. v. ADCO Credit, Inc., - Nev, -, 251 P.3d 714, 718 n. 7 (2011) (broadly interpreting "any breach of a consumer contract'); In re Ordinance 04-75, 192 N.J. 446, 931 A.2d 595, 603 (2007) ("Here, based on its statutory context, the word 'any' clearly is synonymous with 'all.' ").

. See, e.g., Samantar v. Yousuf, 560 U.S. 305, 317, 130 S.Ct. 2278, 176 LEd.2d 1047 (2010) ("[UJse of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive."); People v. W. Air Lines, 42 Cal.2d 621, 268 P.2d 723, 733 (1954) ("The term 'includes' is ordinarily a word of enlargement and not of limitation."); United Rentals Nw., Inc. v. Yearout Mech., Inc., 148 N.M. 426, 237 P.3d 728, 732-33 (2010) ("[Use of the word 'includes' to connect a general clause to a list of enumerated examples demonstrates a legislative intent to provide an incomplete list of activities."); State v. Kurtz, 350 Or. 65, 249 P.3d 1271, 1277 (2011) (Typically, statutory terms such as 'including' . convey an intent that the accompanying list of examples be read in a nonexclusive sense."); see also 2A Norman J. Singer & J.D. SuamBis Sincer, SureErtaNp on Statutes anp Staturory Construction § 47.7, at 305 (2014) (" '[IJncludes' is usually a term of enlargement, and not of limitation.... It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated." (internal quotation marks omitted)).

. See Rahofy v. Steadman, 2012 UT 70, ¶ 12 n. 12, 289 P.3d 534 ("stylistic changes" in legislative amendments have "no substantive effect on our analysis"); Yu v. Clayton, 147 Ill.App.3d 350, 100 Ill.Dec. 916, 497 N.E.2d 1278, 1281 (1986) ("'Where the deleted words are simply surplus-age, there is no change in the law. ...").

. For all of the above reasons, we see no "omission[ ]," infra 181, in the statutory text. Thus, we have no quarrel with the notion that " 'omissions in statutory language should be taken note of and given effect."" Infra ¶ 81 (quoting Biddle v. Wash. Terrace City, 1999 UT 110, ¶ 14, 993 P.2d 875). But in our view there is no omission, as the LRA by its terms expressly encompasses claims involving intentional torts.

. See Schroeder Invs., LC. v. Edwards, 2013 UT 25, ¶¶ 24-25, 301 P.3d 994 ("We ... must imple *634 ment the particular balance of policies reflected in the terms of [the] statute. Those terms are the law...." (alteration in original) (emphasis added)); State v. Clark, 2011 UT 23, ¶ 17, 251 P.3d 829 ("Any suppositions about what the legislature may have intended cannot properly override what it actually did."); see also In re Sinclair, 870 F.2d 1340, 1344 (7th Cir.1989) ("It would demean the constitutionally prescribed method of legislating to suppose that its elaborate apparatus for deliberation on, amending, and approving a text is just a way to create some evidence about the law, while the real source of legal rules is the mental processes of legislators."); Laurence H. Tribe, "Comment," in Antonin Scart, A Matter or Interprstation: Feperar Courts anD THE Law 65, 65 (1997) ("[Ilt is the text's meaning, and not the content of anyone's expectations or intentions, that binds us as law.").

. See T-Mobile USA, Inc. v. Utah State Tax Comm'n, 2011 UT 28, ¶ 21, 254 P.3d 752 ("If the plain language [of a statute] is unambiguous, we do not look to other interpretive tools."); Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("Our inquiry must cease if the statutory language is unambiguous....").

. On the other hand, it may well be impossible to conceptualize the notion of apportioning liability to the "negligence" of a victim of an intentional tort-in "not taking adequate measures to protect herself from [an] assault." Field, 952 P.2d at 1088 (Stewart, J., concurring in part, dissenting in part). But if so, we can expect a jury to reject this notion out of hand (and likewise expect a savvy defendant to avoid making the argument, for fear of inflaming the jury). And in any event, this notion of apportionment may be a true "absurdity'"-a construction so far beyond the realm of the conceivable that we could not possibly attribute it to our legislature, in which case we could reject it despite its compatibility with the statutory text. State ex rel. Z.C., 2007 UT 54, ¶ 13, 165 P.3d 1206 (holding the absurdity canon is properly invoked where a construction is so absurd that "the legislative body which authored the legislation could not have intended it").
A parallel point can be made in response to the concern that our construction, of the statute might lead to its extension to "breach of contract actions and actions for breach of statutory duties since those actions also involve an 'actionable breach of legal duty.'" Field, 952 P.2d at 1087 (Stewart, J., concurring in part, dissenting in part). We see no reason to extend our interpretation in a manner leading to this slippery slope. The Liability Reform Act is all about tort law. Perhaps its principle of "fault" could conceivably be read, in the abstract, to tread into other legal fields. But we don't read statutes in the abstract. We read them in context. And given its context we think the better construction would limit its principle of fault to tortious acts or omissions, and not to extent to breaches of duty rooted in contract or statute.
We are not adopting a principle of apportionment that "has no bounds," as the dissent charges. Infra ¶ 81. We hold, instead, that the bounds of the apportionment principle in the LRA are dictated by the terms of the statute, and not our speculation as to legislative purpose. See infra ¶ 81 (insisting that "[the breadth of possible allocation remains cabined by the intent of the legislature").

. See, e.g., Paragon Family Rest. v. Bartolini, 799 N.E.2d 1048, 1056 (Ind.2003) (upholding jury allocation of fault of 80% to bar and 20% to intentional tortfeasor because the jury "may have chosen to allocate a greater proportion of fault to the Pub than to the assailants because the opportunity for the beating would not even have existed had the Pub not failed to restrict [(the intentional tort-feasor] from entering its bar or had it taken appropriate action to prevent or stop the attach on its parking lot"); Hutcherson v. City of Phoenix, 192 Ariz. 51, 961 P.2d 449 (1998) (in a wrongful death suit, allocating 25% fault to the intentional murderer and 75% fault to the negligent 911 emergency operator); Weidenfeller v. Star & Garter, 1 Cal.App.4th 1, 2 Cal.Rptr.2d 14, 15 (1991) (allocating 20% fault to a bar which failed to protect a patron and 75% to intentional attacker).