# IN THE SUPREME COURT OF IOWA

No. 14–1058

Filed June 10, 2016

**BRENDA J. ALCALA,**

  Appellee,

vs.

**MARRIOTT INTERNATIONAL, INC.** and **COURTYARD MANAGEMENT CORPORATION** d/b/a QUAD CITIES COURTYARD BY MARRIOTT,

  Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Mark J. Smith, Judge.

A personal injury plaintiff seeks further review of court of appeals decision ordering a new trial on her premises liability claims. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

Mark McCormick of Belin McCormick, P.C., Des Moines, for appellants.

Michael K. Bush of Bush, Motto, Creen, Koury & Halligan, P.L.C., Davenport, for appellee.

**WATERMAN, Justice.**

We must decide whether a new trial is required in this premises liability action. Brenda Alcala, a business guest at the Courtyard by Marriott[1] in Bettendorf, slipped and fell on its icy sidewalk, breaking her ankle. The jury found Marriott ninety-eight percent at fault and Alcala two percent at fault and awarded her damages of $1.2 million. The court of appeals concluded the district court's jury instructions were erroneous and ordered a new trial. The court of appeals held the district court abused its discretion by denying Marriott's requested jury instruction on the continuing-storm doctrine, erred by submitting a negligent-training theory without substantial evidence, and erroneously instructed the jury on private industry safety codes. One judge dissented in part, concluding the district court correctly declined to instruct on the continuing-storm doctrine based on the lack of evidence of the requisite storm. The dissent invited our court to clarify whether our standard of review for rulings declining requested instructions is for abuse of discretion or correction of errors at law. We granted Alcala's application for further review.

For the reasons explained below, we conclude a new trial is required. We hold that our standard of review for rulings denying a requested jury instruction is for correction of errors at law. We conclude the district court erred by submitting a negligent-training theory without evidence of the standard of care for training employees on deicing or breach of that standard. Because the jury returned a general verdict, a new trial is required. A new trial is also required because the district

---

[1]Appellants are Marriott International, Inc. and Courtyard Management Corporation, doing business as Quad Cities Courtyard by Marriott. We refer to the appellants collectively as Marriott.

court, over conflicting expert testimony, erroneously instructed the jury that an icy walkway violated a private safety code governing slip-resistant construction *materials*. We decline to decide the applicability of the continuing-storm doctrine. On remand, the parties and district court may address whether the doctrine should be abandoned in light of our adoption of section 7 of the Restatement (Third) of Torts, Liability for Emotional and Physical Harm. We vacate the opinion of the court of appeals, reverse the district court judgment, and remand the case for a new trial consistent with this opinion.

## I. Background Facts and Proceedings.

Alcala, a software consultant, often traveled away from her Texas office and visited clients that were implementing new software. Alcala made these in-person visits so that she could assist clients with final tests and troubleshooting. On January 18, 2010, Alcala arrived in Bettendorf on one such business trip, intending to spend an entire workweek with the client before returning to Texas. She checked into the Courtyard by Marriott in Bettendorf, a few blocks from the office where Alcala would be working. Just before 8 a.m. on January 21, Alcala slipped and fell while exiting the hotel en route to her client's office, breaking her ankle.

In January 2012, Alcala filed suit against the defendants, alleging Marriott negligently caused her injuries because it allowed ice to accumulate on its outdoor walkways, failed to maintain safe premises, failed to properly train their employees responsible for addressing icy sidewalks, and failed to warn guests of the dangerous condition. The case proceeded to trial in February 2014.

**A. The Weather.** An official weather recap encompassing a broad thirteen-county portion of eastern and southeastern Iowa described "an

ice storm over much of eastern Iowa . . . with widespread ice accumulations of ¼ to ½ inch" that occurred on January 20. The recap did not mention anything about conditions in that thirteen-county area on January 21, the day Alcala fell.

Witnesses at trial testified about the weather on the morning of January 21. The Marriott restaurant employee who attended to Alcala immediately after her fall testified "it was bad that morning" but stated she had no difficulty entering the building when she arrived for her shift at 5:15 a.m. and it was not raining or misting at the time Alcala fell nearly three hours later. The employee staffing the front desk recalled no mist at the time Alcala fell. The hotel manager on duty at the time stated, "It was very gray, and I know there was a lot of moisture." One of the paramedics who responded to the 911 call acknowledged "it was rough conditions out." The other paramedic confirmed "there was some bad weather," "it was quite icy," and "[t]here had been an ice storm" but could not remember precise details. The on-call physician who treated Alcala at the hospital after her fall explained that on his morning commute, sidewalks and roads were slick and icy and "there were accidents all over town." Alcala's contact with her Bettendorf client testified "the weather conditions were not good" and affirmed "everyone in the Quad Cities was dealing with the effects of th[e] storm that morning."

When asked if she recalled the weather on January 21, Alcala's client contact testified, "We had some freezing rain" without quantifying the precipitation or specifying when it occurred in relation to Alcala's injury. A paramedic testified generally that "[t]here was a storm that morning." A restaurant employee testified, "[W]e had just had, like, one of those freak ice storm things." However, she further testified she

"believe[d]" the freak ice storm went "into the morning hours as well." She acknowledged that "the weather may have been kind of waxing and waning that morning, as it often does during storms." Marriott witness Margaret DePaepe, the maintenance employee responsible for exterior walkways during the overnight shift, testified that whatever precipitation occurred "was slowing down" when her shift ended around 6 a.m. on January 21 and that any precipitation "had pretty much stopped" by 5:40 a.m.

Certified weather records from the National Climatic Data Center show mist and freezing rain at the Quad City International Airport in nearby Moline, Illinois—about eight miles south of the Marriott— beginning on the morning of January 20. The records show freezing rain last fell at the airport around 6 p.m. that day, while mist was virtually continuous throughout the day and into the night. About half an inch of precipitation accumulated that day, with only trace amounts accruing after 3 p.m. and the last trace accumulating no later than 7 p.m. Mist continued overnight and into the morning of January 21, ending around noon. However, there were no new accumulations, even in trace amounts. Ambient temperatures fluctuated slightly, reaching thirty-four degrees Fahrenheit by 2:15 a.m. on January 21 but decreasing to thirty-two degrees by 7:52 a.m. Overall data shows 0.53 inches of precipitation accumulating on January 20, with no accumulation after 7 p.m. on that day or at any point on January 21.[2]

Data from the Davenport Municipal Airport, about eight miles northwest of the Marriott, provides less detail. Unlike the Moline data,

---

[2]The records list total precipitation as "0.00" for January 21. In context, this does not include even trace amounts because other dates in January show total precipitation as "T," standing for "trace."

the Davenport data does not display a log of observations by hour. Rather, it is a daily summary. On January 20, the Davenport data reflects 0.32 inches of precipitation with "fog or mist" and "freezing rain or drizzle." On January 21, it reflects trace amounts of precipitation, the same two conditions and an additional condition of "smoke or haze"—but because the data is a twenty-four-hour summary, it contains no specific timeline for these observations.

**B. Training of Marriott Employees.** No witness testified as to the standard of practice for training employees on deicing walkways or what employees *should be* taught on that subject. DePaepe testified about her protocol for clearing ice and snow during a shift:

> Q. Why don't you tell the jury what your procedures are for shoveling and salting throughout your shift. A. We just go outside and take a bucket of salt, and then we—take, at the time, a water thing.
>
> Q. Like a pitcher, a scooper? A. It was a water pitcher. And we just sprinkled it everywhere that we could possibly find the ice.
>
> Q. Okay. Now, if there's snow or if there's ice, as it's falling, do you just do the sprinkling, or do you shovel as well? A. We shovel as best we could.
>
> Q. And when you do shovel, do you do that before or after the saltings? A. Before, and then we put the salt down.
>
> Q. So you try to get as much stuff out of the way and then you sprinkle salt on it? A. Yes.
>
> . . . .
>
> Q. When you're out there salting throughout the night, are you checking your own work? Are you walking over the areas that you're salting? A. We check our own work.
>
> Q. Okay. So you're sprinkling and you're walking behind it; is that right? A. Yes.
>
> Q. Now, what if you're walking, walking as you're sprinkling, walking back to put your salt and materials back in the shed, what if you notice a slick spot? A. Then we put more . . . salt and we take care of that spot as soon as possible.

. . . .

Q. So you have a standard operating procedure of going out at least three times in your shift and walking the premises and inspecting and shoveling and salting if necessary. A. Yes.

DePaepe added that no supervisor ever told her to limit the quantities of deicer used on exterior walkways.

On cross-examination, DePaepe elaborated on the extent of her training on snow and ice removal techniques:

Q. When you were trained by Marriott, did you have an understanding that if people did not properly attend to the outside sidewalk, if there was, say, an ice storm and the sidewalk became slippery, that it could become dangerous for people to walk on it? A. Yes.

Q. You were trained about that? A. Yes.

Q. That was important to you? A. Yes.

. . . .

Q. How long were you taught that either salt or de-icing compound could be on that sidewalk before it would become inert and not effective? Were you ever taught that? A. Hum-um.

Q. Is that a no? A. No.

Q. All right. Were you ever taught that you have to be concerned that simply spreading salt would simply melt the ice and it might refreeze? A. Yes.

Q. And if it refroze, you would have to actually use a shovel, true? A. Yes.

Alcala's counsel asked DePaepe to comment on a copy of Marriott's training materials:

Q. Do you recognize this [document entitled] outdoor safety measures? A. No.

Q. This was produced by a Marriott lawyer, saying that these are the type of training that you received. You don't remember seeing this? A. It's been a while. I haven't seen these for a while . . . .

Q. Fair enough. It may not be fair. But would you agree that snow and ice on an exterior sidewalk can be a hazard? A. Yes.

Q. And would you agree that when ice forms, it would be important for a Marriott employee to remove it at once? A. Yes.

Q. And if a Marriott employee didn't do that, that would be a problem for the customers. A. Yes.

Q. And my understanding is that when I asked you in your deposition if you had received any specific training whatsoever from Marriott as to the proper way to remove ice, you just said they told us to go out there and shovel and salt. A. Yes.

On redirect examination, DePaepe clarified the types and frequency of training she received from Marriott:

Q. What kinds of training did you guys receive at the Marriott? A. What we did was go through videos, and when it gets close to the winter season, we have a meeting with all of the house people, all of our maintenance people, I should say, and they go through the procedures of what should . . . be done and how it should be done.

Marriott's counsel offered, and the court received as an exhibit, the packaging from the deicer DePaepe testified she used:

Q. Now, you can see from this bag—it says that it works—it has melting power down to negative 15 degrees; is that fair? A. Yes.

Q. Okay. Now, on the back it has different things about how to use, and the storage, it cautions you not to use too much, tells you only to apply about a quarter cup per square yard. Does it say anything on here about needing to reapply every 15 minutes, every half-hour? A. No.

Q. Does it say anywhere here that this won't work longer than an hour and a half or two hours? A. No.

Q. Did you have any reason to believe that it wouldn't? A. No.

Q. Had it been working appropriately when you'd been taking two-and-a-half to three-hour breaks in between throughout the night? A. Yes.

DePaepe testified she observed no ice problem on the sidewalk at those intervals. However, other witnesses contradicted her. One paramedic who responded to the 911 call estimated the sidewalk in the location where Alcala fell was "eight or higher" on a ten-point scale of

slipperiness—where ten denotes "as slippery as it possibly could be"— even though DePaepe testified she had applied deicer at approximately 5:30 a.m. that day. The paramedic further testified the fire department's personnel spread their own deicer on the sidewalk to allow the paramedics sufficient traction to reach and rescue Alcala safely.

Other evidence relevant to the training of Marriott's employees came from the company's operations manager for the Bettendorf location. The manager explained each maintenance person completes a checklist of tasks during each shift, and she affirmed DePaepe's statement that "standard operating procedure" under the checklist required at least three inspections of walkways and floors during each eight-hour shift. The operations manager further stated, "[I]t was understood with . . . anyone working those shifts, that if it needed to be done more often, to absolutely do it more often." No witness testified as to any deficiency in Marriott's training procedures or documents.

**C. Private Safety Standards.** Alcala and Marriott each presented an expert addressing industry standards for slip resistance and snow and ice removal. Russell Kendzior testified on Alcala's behalf about standards promulgated or approved by the American Society for Testing and Materials (ASTM) and the American National Standards Institute (ANSI). He opined the standards were applicable under the circumstances of this case even though they are voluntary, not mandatory. Section 5.13 of ASTM Standard F1637 requires walkway surfaces to be slip resistant under expected environmental conditions and use, especially when conditions may be reasonably foreseeable. Kendzior opined that the phrase "expected environmental conditions" accommodates the notion that during some weather events it may be impossible to provide a perfectly slip-resistant surface. Kendzior also

discussed sections 5.7.1.1 and 5.7.1.2 of the standard, which state exterior walkways "shall be slip resistant" and consider a slippery surface substandard. Kendzior testified, "[B]room-finished sidewalks are the industry standard. That's what's required by code. . . . [T]hey provide a very ample degree of slip resistance when dry." In Kendzior's opinion, however, an icy surface is by definition slippery and therefore substandard under that code.

ANSI standard A1264.2, to which Kendzior also referred, provides suggested protocols for clearing snow and ice from walkways and parking lots. Specifically, section 10.3.1 of the standard instructs land occupiers to use deicing compounds according to manufacturer instructions that may include reapplication after a length of time. Kendzior read from the ASTM and ANSI standards during his testimony while the jury viewed them via a projector, but neither party introduced a copy of them into evidence.

In contrast, Marriott's expert, architect Alan Bowman, testified the slip resistant ASTM standard applied to the finish applied to the concrete surface, not slipperiness from snow or ice. He noted ASTM once considered promulgating a standard for snow and ice removal but scrapped the proposal because the organization's members could not agree on an appropriate global standard. Bowman testified the Marriott's sidewalk was constructed with broom-finished concrete that met the ASTM standard:

> Q. Now, let's look at the cement itself. What kind of a finish is on this concrete? A. Well, the metric that you use in terms of sidewalk performance is its slip resistance, and the most cost effective way to achieve slip resistance with concrete is to broom finish it. You take a stiff bristle broom while the concrete is, what we call, thumbprint hard, and you drag the broom across the concrete and then let it finish curing, and that creates a fine corduroy effect. It's about

l6th-of-an-inch-high grooves in the concrete. All of the measures that I'm familiar with, ASTM standards, for example, and the ANSI standards, consider broom-finished concrete to be slip resistant, and that's on the scale of, basically, from zero, which would be just slick as glass, to one. And broom-finished concrete, wet or dry, always ranks between 0.5 and 0.8, so it's considered, under wet or dry conditions, to be a slip-resistant surface.

Q. And this was broom-finished concrete. A. Everything, according to the Donahue site plan documents and everything that I witnessed in a walk-around of the Marriott facility, everything is broom-finished concrete.

Q. And that, I think, even Mr. Kendzior mentioned, is really the standard in the industry. A. Pardon me?

Q. Mr. Kendzior mentioned that's the standard in the industry, broom-finished concrete. A. Yes.

Q. Now, just to make it clear, though, that means that this surface is slip resistant wet or dry? A. Wet or dry, yes.

**D. The Jury Instructions.** Before submitting the case to the jury, the parties made a record on jury instructions. Marriott sought a jury instruction detailing the continuing-storm doctrine. This doctrine provides that, absent unusual circumstances, a premises occupier may "await the end of the storm and a reasonable time thereafter to remove ice and snow from an outdoor entrance walk, platform, or steps." *Reuter v. Iowa Tr. & Sav. Bank*, 244 Iowa 939, 943, 57 N.W.2d 225, 227 (1953) (quoting *Walker v. Mem'l Hosp.*, 45 S.E.2d 898, 902 (Va. 1948)). Marriott contended it was entitled to this instruction because several witnesses testified generally that the weather was bad on the morning of January 21 and because the certified weather records from nearby locations reflected mist that day. *See Rochford v. G.K. Dev., Inc.*, 845 N.W.2d 715, 718 (Iowa Ct. App. 2014) (concluding the doctrine includes freezing rain, not just blizzards). Thus, Marriott asserted the jury should decide whether the storm was continuing when Alcala fell or, if it had ended, whether Marriott waited a reasonable time after the storm passed to remove the ice from the sidewalk where Alcala fell.

The district court refused to give the instruction because it concluded there was insufficient evidence supporting it. The district court concluded trace precipitation and mist do not constitute a "storm" within the plain meaning of the word or under our caselaw applying the continuing-storm doctrine. Indeed, the district court noted the weather records considered mist to be an obscuration like fog, not a type of precipitation. Furthermore, the district court concluded witnesses' general testimony that roads and sidewalks were slick and icy on the morning of January 21, that "it was rough conditions out," or that "the weather conditions were not good" spoke only to the persisting effects of the storm, not whether it was actively continuing at times relevant to this case.

The court also overruled Marriott's objections to two additional instructions. First, Marriott contended the ASTM and ANSI standards were not applicable and it was therefore inappropriate to instruct the jury it could conclude violation of the standards was evidence of negligence. Second, Marriott contended there was insufficient evidence to support improper training, one of Alcala's asserted specifications of negligence. The district court concluded a jury instruction on industry standards was appropriate despite the experts' conflicting opinions on the standards' applicability. It also concluded DePaepe's testimony was substantial evidence supporting an instruction including improper training as a specification of negligence.

Instruction No. 20, as submitted to the jury, stated,

American Safety and Testing Materials (ASTM) Standard Practice for Safe Walking Surfaces requires exterior walkways shall be maintained so as to provide safe walking conditions (5.7.1). In addition, said standards require that exterior walkways shall be slip resistant (5.7.1.1). Finally, if

an exterior walkway is slippery, it is to be considered substandard (5.7.1.2).

American National Standards Institute (ANSI) require that where snow and ice exists in pedestrian walkways, safe maintenance techniques shall include plowing, shoveling, deicing, salting or ice melting chemicals, and sanding, as needed (10.3.1).

You may consider a violation of these standards as evidence of negligence.

Instruction No. 16 allocated to Alcala the burden of proving Marriott was negligent in at least one of four ways: (1) improper training, (2) inadequate maintenance, (3) failing to inspect the walkway, or (4) failing to provide a slip-resistant walkway.

**E. The Verdict and Appeal.** The jury returned a general verdict finding Marriott negligent without identifying which specification or specifications of negligence Alcala proved. The jury allocated ninety-eight percent of the fault to Marriott, two percent to Alcala, and awarded Alcala total damages of $1.2 million for medical expenses, lost wages, pain and suffering, and loss of bodily function. Marriott moved for judgment notwithstanding the verdict, remittitur, or new trial, asserting the district court erred in denying a continuing-storm instruction and in submitting the other instructions to which Marriott objected. The district court denied the motion.

Marriott appealed, and we transferred the case to the court of appeals. The court of appeals ordered a new trial because it concluded the evidence supported a continuing-storm instruction and did not support the instructions on industry standards and improper training. One judge dissented in part, concluding the district court correctly refused to instruct on the continuing-storm doctrine. We granted Alcala's application for further review.

## II.  Standard of Review.

We have said "[w]e review a court's refusal to give an instruction for an abuse of discretion, while we review challenges to jury instructions for correction of errors at law." *Anderson v. State*, 692 N.W.2d 360, 363 (Iowa 2005).  However, this distinction is relatively recent, growing primarily out of a 2003 decision.  *See State v. Piper*, 663 N.W.2d 894, 914 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010).  In *Piper*, we stated "review of alleged instructional error depends on the nature of the supposed error" and cited a case indicating the refusal to give an inference instruction on alleged spoliation is properly reviewed for an abuse of discretion.  *Id.* (citing *State v. Langlet*, 283 N.W.2d 330, 336 (Iowa 1979) (holding the district court did not abuse its discretion in denying a spoliation instruction as there was no evidence of an intent to destroy evidence)).

We conclude *Langlet* correctly states the standard of review of the district court's refusal to give an inference instruction on spoliation because that instruction acts as a discovery sanction and discovery sanctions are discretionary.  *See Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 491 (Iowa 2000) (discussing the spoliation inference and its remedies); *Farley v. Ginther*, 450 N.W.2d 853, 856 (Iowa 1990) (noting the discretionary nature of discovery sanctions).  However, the standard of review applied in *Langlet* and referenced in *Piper* does not extend to *all* refusals to give a requested jury instruction.

"Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994); *accord Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 823–24 (Iowa 2000); *Herbst v. State*, 616 N.W.2d 582, 585 (Iowa 2000).  The verb

"require" is mandatory and leaves no room for trial court discretion. Thus, we clarify today that absent the discretionary component present in *Langlet,* we review refusals to give a requested jury instruction for correction of errors at law. *See, e.g., DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5, 11–14 (Iowa 2009) (reviewing multiple jury instruction claims, including refusal to give a requested pretext instruction, for errors at law); *Koenig v. Koenig*, 766 N.W.2d 635, 637 (Iowa 2009) (reviewing a district court's refusal to give a general negligence instruction for errors at law); *Banks v. Beckwith*, 762 N.W.2d 149, 151 (Iowa 2009) (reviewing a district court's refusal to give a res ipsa loquitur instruction for errors at law); *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004). To the extent our cases perpetuate the *Piper* distinction and extend the abuse-of-discretion analysis to nondiscretionary refusals to give requested jury instructions supported by the evidence and applicable law, we overrule them on that issue.[3]

**III. Analysis.**

**A. Negligent Training.** We must decide whether the district court erred by submitting the negligent-training theory without any testimony on the standard of care for training or its breach. It is axiomatic that proof of the applicable standard of care and its breach are required to

---

[3]*See, e.g., State v. Guerrero Cordero*, 861 N.W.2d 253, 258 (Iowa 2015); *State v. Edouard*, 854 N.W.2d 421, 431 (Iowa 2014); *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496 (Iowa 2014); *Hagenow v. Schmidt*, 842 N.W.2d 661, 670 (Iowa 2014); *State v. Frei*, 831 N.W.2d 70, 73 (Iowa 2013); *Crawford v. Yotty*, 828 N.W.2d 295, 298 (Iowa 2013); *State v. Becker*, 818 N.W.2d 135, 140 (Iowa 2012); *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010); *State v. Lyman*, 776 N.W.2d 865, 876 (Iowa 2010); *State v. Reynolds*, 765 N.W.2d 283, 288 (Iowa 2009); *Smith v. Koslow*, 757 N.W.2d 677, 679–80 (Iowa 2008); *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006); *In re Det. of Palmer*, 691 N.W.2d 413, 416 (Iowa 2005); *Kiesau v. Bantz*, 686 N.W.2d 164, 171 (Iowa 2004). Of course, clarifying the standard of review for jury instruction challenges does not disturb the substantive legal conclusions in these decisions.

recover in tort. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) ("An actionable claim of negligence requires 'the existence of a duty to conform to a standard of conduct to protect others, [and] a failure to conform to that standard . . . .' " (quoting *Stotts v. Eveleth*, 688 N.W.2d 803, 807 (Iowa 2004))). Dismissal is required when the record contains no evidence regarding the applicable standard of care or its breach. *See Godar v. Edwards*, 588 N.W.2d 701, 709–10 (Iowa 1999) (affirming directed verdict in defendant's favor on claims against employer for negligent hiring, retention, and supervision); *Hartig v. Francois*, 562 N.W.2d 427, 430–31 (Iowa 1997) (holding defendant was entitled to directed verdict on negligence claims based on insufficient evidence of the standard of care or its breach); *Fisher v. Dallas County*, 369 N.W.2d 426, 431 (Iowa 1985) (affirming dismissal because the "record contains no evidence regarding that standard of care" or its breach).

Marriott argues on appeal that reversal is required because "[t]he record contains no evidence of a standard of care imposing a discrete duty on Marriott to instruct employees about a specific period of time that a particular deicing compound will remain effective." Alcala argues *expert* testimony was not required to establish the standard of care for training employees on ice removal. Regardless, there must be some evidence or testimony to support the instruction on negligent training. No witness, lay or expert, testified that Marriott should have trained DePaepe on the durational effectiveness of the deicer. *Cf. Tomeo v. Thomas Whitesell Constr. Co.*, 823 A.2d 769, 777 (N.J. 2003) (affirming summary judgment dismissing negligent-training claim as to employee's use of snowblower, concluding "[n]o special training was required to be given . . . because it is a consumer product" with adequate warnings and instructions). No expert or lay witness testified about *any* shortcoming

in Marriott's training or what training should be provided. Alcala argues the jury can find Marriott breached a duty to train DePaepe by connecting these dots: there was ice on the sidewalk; therefore, DePaepe did not apply deicer properly; therefore, Marriott did not train her properly. If that is sufficient, then going forward, employers could be sued for negligent training whenever there is an avoidable accident. We conclude that the evidence in this case was insufficient to support a negligent-training instruction or specification of negligence.

Other courts have held that negligent-training claims fail as a matter of law without testimony establishing the standard of practice for training employees for the job at issue. Judge Merrick Garland recently surveyed many such decisions in *Burke v. Air Serv International, Inc.*, 685 F.3d 1102, 1106–07 & n.2 (D.C. Cir. 2012) (affirming summary judgment dismissing negligent-training claim). *See also Moore v. District of Columbia*, 79 F. Supp. 3d 121, 144–45 (D.D.C. 2015) (surveying authorities and granting summary judgment dismissing negligent-training claims). It is not enough to show the mistakes or negligent conduct of the employee; rather, to recover against the employer under a negligent-training theory, evidence of a *specific* standard of care for training *and its breach* is required. *See Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1156–57 (N.D. Cal. 2014) (granting summary judgment dismissing negligent-training claim because "[p]laintiffs do not link any of the evidence [of the errors of an Amtrak train engineer] to any *specific* federal standard of care [for training] . . . or explain how the evidence, if credited by the jury, would establish a violation of such a standard"); *Wimer v. State*, 841 P.2d 453, 455 (Idaho Ct. App. 1992) (affirming summary judgment dismissing claim that the state negligently trained game officers who charged elk hunters with criminal violations;

concluding affidavit testimony that the "training and supervision must have been deficient because of the manner in which *this* investigation was conducted" was insufficient to support an inference based on a "single incident standing by itself" (quoting *Anderson v. City of Pocatello*, 731 P.2d 171, 181 (Idaho 1986))).

In *Inmon v. Crane Rental Services, Inc.*, the Arizona Court of Appeals affirmed a partial summary judgment dismissing a negligent-training claim. 67 P.3d 726, 733 (Ariz. Ct. App. 2003), *overruled on other grounds by Tarron v. Bowen Mach. & Fabricating, Inc.*, 235 P.3d 1030, 1036 (Ariz. 2010) (en banc). Charles Inmon and Mark Cummings, ironworkers, were injured when a loaded crane operated by Eddie De La Torre tipped over at their jobsite. *Id.* at 727–28. They sued his employer, a crane rental company, alleging it was independently negligent in training him. *Id.* at 728. The plaintiff's expert testified he "could not say that De La Torre was improperly trained, but only that his actions did not demonstrate proper training." *Id.* at 733. The trial court granted the crane rental company's motion for summary judgment on that issue, noting the lack of testimony "to indicate what training was omitted" and concluding the "[f]ailure to demonstrate competence is not automatically a showing of inadequate training." *Id.* The appellate court agreed and rejected the plaintiffs' argument that the fact finder could infer negligent training, stating, "[I]n the absence of facts specifying in what way De La Torre's training or lack thereof was negligent, . . . there is no evidence showing that such negligent training was the proximate cause of Plaintiffs' injuries." *Id.* We see the same failure of proof as to Alcala's negligent-training claim.

Alcala cites no case from any jurisdiction upholding a recovery on a record devoid of testimony as to the standard for training for the job at

issue and devoid of testimony as to how the training fell short. We hold it was error to submit negligent training as one of the specifications of Marriott's negligence. The jury returned a general verdict without specifying which grounds of fault Alcala proved. A new trial is required after a general verdict is returned for the plaintiff if the evidence was insufficient to submit one of several specifications of negligence. *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 497 (Iowa 2014). That is what happened here.

**B. Private Safety Codes.** We conclude a new trial is also required based on the district court's prejudicial error in the jury instruction on the ASTM standards. "We have on a number of occasions found instructions that unduly emphasized certain evidence were flawed and required reversal." *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 106 (Iowa 2013); *see also Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 287 (Iowa 1994) ("[E]ven instructions correctly stating the law should not give undue emphasis to any particular theory, defense, stipulation, burden of proof, or piece of evidence."). The district court went beyond unduly emphasizing certain evidence—the trial judge adopted the position of plaintiff's expert over conflicting testimony of the defense expert in Instruction No. 20:

> American Safety and Testing Materials (ASTM) Standard Practice for Safe Walking Surfaces requires exterior walkways shall be maintained so as to provide safe walking conditions (5.7.1). In addition, said standards require that exterior walkways shall be slip resistant (5.7.1.1). Finally, if an exterior walkway is slippery, it is to be considered substandard (5.7.1.2).
>
> . . . .
>
> You may consider a violation of these standards as evidence of negligence.

The defense expert, Bowman, testified the ASTM standard is inapplicable to snow and ice removal and instead governs the methods and materials used for constructing walkways. Experts for both sides agreed the type of slip-resistant, broom-finished concrete used in the construction of Marriott's sidewalk complied with ASTM standards when dry. The only reason the sidewalk was slippery was the presence of ice. Bowman further gave uncontroverted testimony that ASTM had considered adopting a standard for snow and ice removal but abandoned the idea due to lack of agreement on such a standard. The existing ASTM standards do not mention ice or snow. Yet the jury was essentially instructed that an icy sidewalk is substandard. That is not how we interpret the ASTM standard. Alcala cites no case from any jurisdiction holding ASTM standard 5.7 is violated when an otherwise compliant broom-finished concrete surface is icy, and we found no such case in our own research.

Even assuming the expert testimony was sufficient to generate a jury question regarding the applicability of the standard, the district court erred by taking one side and telling the jury the standard was violated by icy conditions. *See Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 744 (W.D.N.Y. 2015) ("Usually, when there is a factual question about the applicability of two competing industry standards, it is for the fact-finder to determine which standard applies."). When experts disagree, the jury should be instructed to decide whether the standard applies. *See Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 43 (E.D.N.Y. 2010) ("[T]he applicability of the ANSI and OSHA standards is a factual question. . . . Accordingly, . . . it should be for the fact-finder to determine whether [the expert's] reliance on the

ANSI and OSHA standards is appropriate."). The district court erred in giving Instruction No. 20, and that error requires a new trial.

**C. The Continuing-Storm Doctrine.** The court of appeals majority concluded Marriott was entitled to its requested instruction on the continuing-storm doctrine. The dissenting judge concluded the evidence was insufficient to support a jury instruction on the doctrine. Because we have determined that the instructional errors discussed above require a new trial, we need not decide whether the district court erred by refusing Marriott's requested instruction on the continuing-storm doctrine. We recognize the issue will arise again on remand if Marriott renews its request for an instruction on the doctrine.

We adopted the continuing-storm doctrine in *Reuter*. 244 Iowa at 943, 57 N.W.2d at 227. Quoting from a Virginia case, we established

> the rule that a business establishment, landlord, carrier, or other inviter, in the absence of unusual circumstances, is permitted to await the end of the storm and a reasonable time thereafter to remove ice and snow from an outdoor entrance walk, platform, or steps. The general controlling principle is that changing conditions due to the pending storm render it inexpedient and impracticable to take earlier effective action, and that ordinary care does not require it.

*Id.* (quoting *Walker*, 45 S.E.2d at 902).

In *Rochford*, the court of appeals concluded inclement winter weather could constitute a storm even if it is not a blizzard. 845 N.W.2d at 718. In that case, however, it was undisputed the plaintiff's fall occurred during freezing rainfall. *See id.* Thus, the holding in *Rochford* does not clearly extend to mist or other precipitation leaving no accumulation.

Iowa courts have applied the continuing-storm doctrine in a few other cases. For example, in *Wailes v. Hy-Vee, Inc.*, the court of appeals concluded the district court correctly gave a jury instruction on the

continuing-storm doctrine when the plaintiff challenged the timing of the defendant's snow removal but snow was still falling when the plaintiff was injured. 861 N.W.2d 262, 265–68 (Iowa Ct. App. 2014). We also applied the continuing-storm doctrine and granted a defendant judgment notwithstanding the verdict when "a trace of snow was recorded" on the day of the plaintiff's fall, "[i]t had been snowing off and on all morning," and "it was still snowing" at the time the plaintiff fell. *Hovden v. City of Decorah*, 261 Iowa 624, 628, 155 N.W.2d 534, 537 (1968), *superseded by statute*, 1984 Iowa Acts ch. 1002, § 1.

This court has acknowledged "[t]he feebleness of human . . . efforts in attempting to cope with the power of the elements." *Staples v. City of Spencer*, 222 Iowa 1241, 1244, 271 N.W. 200, 202 (1937). The continuing-storm doctrine suspends a property owner's general duty to exercise reasonable care in warning of or removing snow and ice hazards until a reasonable time after the storm because continually clearing ice and snow during an ongoing storm would be impracticable. *Reuter*, 244 Iowa at 943, 57 N.W.2d at 227; *Mattson v. St. Luke's Hosp. of St. Paul*, 89 N.W.2d 743, 745 (Minn. 1958); *Walker*, 45 S.E.2d at 902.

Alcala in her application for further review argued for the first time that the continuing-storm doctrine is no longer good law under the Restatement (Third) of Torts, Liability for Physical and Emotional Harm. The parties, however, did not address the impact of the Restatement (Third) on the continuing-storm doctrine in their appellate briefs preceding the court of appeals decision or in district court before the jury was instructed. Neither the district court nor court of appeals addressed whether the continuing-storm doctrine should be abandoned in light of our adoption of section 7 of the Restatement (Third) of Torts in *Thompson* in 2009. 774 N.W.2d at 834–35; *cf. Crawford v. Extended Stay Am., LLC,*

No. 2007-CA-001127-MR, 2008 WL 2610456, at *4 (Ky. Ct. App. July 3, 2008) (Acree, J., concurring) (inviting Kentucky Supreme Court to revisit "no-duty" rule for natural snow and ice accumulations in light of section 7 of the Restatement (Third)). We prefer to wait to decide the issue with the benefit of a district court ruling and full adversarial briefing. Accordingly, we decline to decide it now. *See Hagenow v. Schmidt*, 842 N.W.2d 661, 677 (Iowa 2014) ("[N]either the parties nor the district court raised the provisions of the Restatement (Third) when instructing the jury in this case. We defer for another day our consideration of these provisions . . . ."). The parties are free to brief and argue that issue on remand and may develop a different evidentiary record on weather conditions in the new trial.

## IV. Disposition.

For the foregoing reasons, Marriott is entitled to a new trial. We vacate the decision of the court of appeals, reverse the district court judgment, and remand the case for a new trial consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

All justices concur except Hecht, Wiggins, and Appel, JJ., who concur in part and dissent in part.

#14–1058, *Alcala v. Marriott Int'l, Inc.*

**HECHT, Justice (concurring in part and dissenting in part).**

I join Part II of the majority opinion clarifying that the scope of review regarding refusal to give a requested jury instruction is for correction of errors at law. Beyond that threshold question, however, the majority and I part ways significantly. I dissent because I find no reversible error in either of the jury instructions Marriott challenges on appeal. I also conclude the district court correctly declined on this record to submit the instruction proposed by Marriott on the continuing-storm doctrine. I would vacate the decision of the court of appeals and affirm the judgment the district court entered on the jury's verdict.

**I. Negligent Training.**

The law governing this issue is well established. "In considering whether [an] instruction is supported by substantial evidence, we give the evidence the most favorable construction it will bear in favor of supporting the instruction." *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496–97 (Iowa 2014). The majority orders a new trial in part because it concludes no testimony established the parameters of Marriott's duty to exercise reasonable care in training its employees on proper approaches in removing ice from sidewalks. But Marriott *concedes* it owed a duty.[4] Its objection to the training specification of

---

[4]It comes as no surprise that Marriott did not deny it owed a duty to exercise reasonable care in training its employees on the subject of removing ice from its sidewalks. Under section 7(a) of the Restatement (Third) of Torts, an "actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." 1 Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7(a), at 77 (2010) [hereinafter Restatement (Third)]; *see Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009) (adopting the Restatement (Third)'s duty framework). "Thus, in cases involving physical harm, courts ordinarily need not concern themselves with the existence or content of this ordinary duty. They may proceed directly to the elements of liability . . . ." 1 Restatement (Third) § 6 cmt. *f*, at 69. Those four elements of a prima facie claim for negligence are "(1) failure to exercise reasonable care;

negligence was instead that Alcala failed to present substantial evidence of a *breach* of that duty.

Alcala did not present expert testimony on the standard of care hotels must meet in training their employees on proper snow and ice removal techniques or on Marriott's breach of that duty. In my view, however, expert testimony was not required on these subjects. "The question of what a reasonable person would do . . . in training and supervising employees is one permissibly resolved on the basis of the knowledge and experience of lay persons." *Graves v. N.E. Servs., Inc.*, 345 P.3d 619, 628 (Utah 2015).[5]

Some weather-related phenomena are clearly within a layperson's understanding:

---

(2) factual cause; (3) physical harm; and (4) harm within the scope of liability (which historically has been called 'proximate cause')." *Id.* § 6 cmt. *b*, at 67–68. Thus, Alcala had no burden to present express testimony that Marriott owed a duty to exercise reasonable care in training its employees on the proper methods of clearing ice from its sidewalks.

[5]Although expert testimony was not required to justify submission of the issue to the jury, it would of course have been admissible. In a 1963 slip-and-fall case where the fall occurred on an indoor dance floor, we concluded a court properly admitted expert testimony from those familiar with "care of waxed floors and the safe practices in wax application thereon." *Smith v. Cedar Rapids Country Club*, 255 Iowa 1199, 1210, 124 N.W.2d 557, 564 (1963). The testimony was helpful because it aided jurors in understanding the interplay between the particular chemical used and the material comprising the dance floor on which the injury occurred, as well as "the proper application and slipperiness of" the floor wax. *Id.* at 1211, 124 N.W.2d at 564. However, *Smith* does not stand for the proposition that expert testimony was required in this case on the question whether Marriott breached its duty to train its employees properly. First, I believe laypeople are more familiar with ice, deicer, and concrete sidewalks than the properties of the floor wax when applied to the flooring material at issue in that case. Second, and more importantly, we concluded in *Smith* only that expert testimony was permissible, not that it was required to engender a jury question. *See id.* at 1210–11, 124 N.W.2d at 564–65; *accord Boham v. City of Sioux City*, 567 N.W.2d 431, 437 (Iowa 1997) (concluding expert testimony about crossing guard training was sufficient—not that it was required—to support a failure-to-train specification of negligence).

> We know that it is dangerous to be in or near certain structures, or even trees, during lightning storms. We also know that, if we are in an area of high lightning frequency, we should be cautious, and that the height of the structures in relation to the surrounding terrain might attract lightning. In other words, . . . risk assessment factors [regarding lightning damage protection] [a]re not complicated or novel ideas or even foreign to a layperson's understanding about the phenomenon of lightning.

*Mensink v. Am. Grain*, 564 N.W.2d 376, 381 (Iowa 1997). Similarly, a plaintiff need not present an engineer to opine that stacking logs haphazardly might result in the pile toppling over and injuring a bystander:

> Where the construction of a given pile of timber is properly explained, it appears to us that a jury of [people] not especially experienced in piling timber would have no difficulty in forming an opinion for themselves as to the liability of the pile to fall and injure a person who should be near it. Such work, it seems to us, does not in any proper sense involve the mystery of technical knowledge or skill.

*Baldwin v. St. Louis, Keokuk & N. Ry.*, 68 Iowa 37, 39, 25 N.W. 918, 919 (1885). Likewise, I would hold deicer's durational effectiveness and Marriott's duty to address the subject when training its employees on proper techniques for removing ice from sidewalks does not require expert testimony. Information on the durational effectiveness of the deicer Marriott used is discernable from the product manufacturer without special knowledge, education, or expertise. Indeed, Bowman—an expert in architecture but a layperson with respect to commercial snow and ice removal—demonstrated his ability to discern the durational effectiveness simply by reading available product literature. *See Spencer v. Wal-Mart Stores E., LP*, 930 A.2d 881, 888–89 (Del. 2007) (noting an architect was not "an expert on ice and snow removal").

I now turn to the question of whether the record—when viewed in the light most favorable to the instruction, *see Asher*, 846 N.W.2d at

496–97—includes substantial evidence of a breach of Marriott's duty to properly train its employees. Unlike the majority, I conclude the record does include evidence from which the jury could find Marriott breached its duty to exercise reasonable care in training.

The evidence on the condition of Marriott's sidewalk and the presence of adequate quantities of deicer is conflicting and greatly in dispute. DePaepe testified there was already "salt all over the sidewalks" when she arrived for her overnight shift at 10:00 p.m. on January 20. Although a reasonable fact-finder could find on this record that there was no new measurable precipitation during her shift, DePaepe testified—and her nightly checklist represents—that she applied more deicer three times during her eight hours: from 12:03 to 12:20 a.m., 2:29 to 2:59 a.m., and 5:24 to 5:40 a.m. If Bowman's testimony that the deicer generally remains effective for three to four hours is correct, and DePaepe's testimony is true, any failure to train DePaepe about durational effectiveness of the deicer arguably did not cause Alcala's injury because DePaepe testified she reapplied the deicer within the product's durational effectiveness.

But the jury was entitled to make credibility determinations and sort out conflicts in the evidence. DePaepe testified there was plenty of deicer on the sidewalk both when she arrived at 10:00 p.m. on January 20 and when she left after 6:00 a.m. on January 21. Marriott's operations manager testified she remembered the deicer granules crunching under her boots as she entered the building around 7:00 a.m. on January 21. However, other evidence tended to show that at the time Alcala fell, the sidewalk was treacherously slick. The paramedics who responded to the 911 call testified they "had a hard time getting to" Alcala and "were having a hard time staying" upright themselves. One

even testified the sidewalk was "eight or higher" on a ten-point slipperiness scale and that the fire department dispensed its own chemical to provide the paramedics with better traction. Furthermore, another witness who was a guest at the Marriott testified that when he left the hotel just before Alcala, the sidewalk was so slippery that he opted to walk on the adjacent grass instead to avoid falling.

A reasonable juror could infer from this conflicting evidence that DePaepe did not apply the deicer with the frequency she claimed. A reasonable fact finder could also find from DePaepe's testimony that she had not been trained on the deicer's durational effectiveness. The jury could find that had DePaepe been provided this information during training or instructed to seek out such information and follow it, she would have understood any deicer applied before 3:00 a.m. (and certainly before 10:00 p.m. the night before) would no longer be effective after four hours if temperatures remained around freezing. In other words, if DePaepe's testimony about distribution of the deicer and the condition of the sidewalk at material times was rejected as not credible in whole or in part, the jury could have found on this record that her failure to apply the deicer properly was a result of Marriott's inadequate training on the durational effectiveness of the deicer. Put yet another way, the jury could have found that DePaepe did not apply the deicer in a timely fashion because she was not properly trained on its durational effectiveness. This conclusion would require the jury to make several inferences, but fact finders properly utilize inferences in almost every case.

I also reject the majority's conclusion that a jury question on negligent training must fail because Alcala did not offer express testimony that Marriott breached its duty to exercise reasonable care in

training its employees. All manner of negligence claims that do not require expert testimony to establish a standard of care are submitted to juries—and have been for decades—without express testimony from a witness that the defendant breached a duty owed to the plaintiff. For example, in automobile negligence cases, trial judges commonly submit a specification of negligence on the duty to keep a proper lookout without express testimony—lay or expert—that the defendant breached the duty. *See, e.g., Graber v. City of Ankeny*, 616 N.W.2d 633, 643–44 (Iowa 2000) (concluding the record contained sufficient evidence to support an instruction on proper lookout when both drivers testified about what they saw immediately before the collision); *Luther v. Jones*, 220 Iowa 95, 103, 261 N.W. 817, 821 (1935) (concluding the trial court correctly submitted proper lookout to the jury even though there was "no evidence, aside from the fact of the accident, that [the defendant] failed to keep a proper lookout").

Similarly, in premises liability cases against grocers, specifications of negligence are commonly submitted to juries without express testimony that grocers breached the duty to keep walkways free of hazards. *See, e.g., W. Supermarkets, Inc. v. Keith*, 528 So. 2d 317, 320–21 (Ala. 1988) (concluding a negligence claim was properly submitted to the jury based on the plaintiff's testimony about what she observed and the store employees' testimony that they swept and cleaned at regular intervals); *Strack v. Great Atl. & Pac. Tea Co.*, 150 N.W.2d 361, 363 (Wis. 1967) (concluding a jury's finding that a store "failed to inspect and sweep within a reasonable time before the accident" had "adequate support in the evidence" even though there was "no direct testimony establishing the Italian prune [on which the plaintiff slipped] was on the floor" for a lengthy period). Just as the court in *Strack* did not require

the plaintiff to produce express testimony that the defendant grocer breached its duty to keep its aisles safe for customers by leaving a prune on the floor too long, Alcala had no burden to produce testimony that Marriott breached its duty to properly train DePaepe when it failed to train her on the durational effectiveness of the deicing compound she was required to use on the company's sidewalks. And just as we do not require a plaintiff to produce express testimony that the defendant failed to keep a proper lookout while driving her car at the time of a crash, Alcala had no burden to produce express testimony on Marriott's breach of its duty to train DePaepe in this case.

I acknowledge the jury could conclude on this record that DePaepe was credible and that she dutifully applied deicer three times during her shift at the times she recorded on her checklist. But in evaluating the sufficiency of the evidence supporting a jury instruction, "we give the evidence the most favorable construction it will bear in favor of supporting the instruction." *Asher*, 846 N.W.2d at 496–97. Perhaps Alcala could have presented more evidence supporting the improper training specification of negligence, but what she did present—testimony permitting the jury to conclude DePaepe was not trained on the durational effectiveness of the deicing compound—was in my view at least minimally sufficient to engender a jury question on the training specification of negligence. I would therefore hold the district court did not err in submitting Instruction 16.

## II.  Private Industry Standards as Evidence of Negligence.

I also disagree with the majority's conclusion that the district court erred in giving Instruction 20. The majority holds that because Russell Kendzior and Alan Bowman provided different opinions as to the industry safety standards' applicability, the district court should have

permitted the jury to determine whether the ASTM and ANSI standards were applicable. This conclusion misunderstands the allocation of responsibility between the court and the jury on the issues of duty and breach.

While industry standards may have "no legislative sanction, it is difficult to conceive a better test of care than compliance with [their] provisions." *Smith v. Iowa Pub. Serv. Co.*, 233 Iowa 336, 337, 6 N.W.2d 123, 123 (1942). As the New Jersey Supreme Court has explained,

> A safety code ordinarily represents a consensus of opinion carrying the approval of a significant segment of an industry. Such a code is not introduced as substantive law, as proof of regulations or absolute standards having the force of law or of scientific truth. It is offered in connection with expert testimony which identifies it as illustrative evidence of safety practices or rules generally prevailing in the industry, and as such it provides support for the opinion of the expert concerning the proper standard of care.

*McComish v. DeSoi*, 200 A.2d 116, 120–21 (N.J. 1964). In other words, industry standards, if relevant, properly inform the court's determinations whether the defendant owes a duty to the plaintiff and what that duty is.

The existence of a legal duty and the scope of that duty are questions of law for the court, not questions of fact for the jury. *See, e.g., Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 693 (Iowa 2009); *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 880 (Iowa 2009); *see also* 1 Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6 cmt. *b,* at 67 (2010) [hereinafter Restatement (Third)]. Thus, the court—not the jury—must decide whether a proffered industry standard is applicable to a given set of facts. *See Hansen v. Abrasive Eng'g & Mfg., Inc.*, 856 P.2d 625, 628 (Or. 1993) (en banc) (discussing an ANSI standard and noting "[d]etermination of the appropriate standard of

care is an issue of law"). " '[A]pplicability' connotes no . . . compulsion to *conform* with a particular standard. Rather, 'applicability' connotes mere relevance . . . ." *Keller v. United States*, 38 F.3d 16, 26 (1st Cir. 1994) (citation omitted). Typically the court determines applicability of industry standards through rulings in advance of trial or relevance objections during trial. If a standard has no application to the circumstances of the case, it is irrelevant to the court's duty analysis. *See Aller v. Rodgers Mach. Mfg. Co.*, 268 N.W.2d 830, 840–41 (Iowa 1978) (affirming a trial court's exclusion of some industry safety standards, in part because some of the standards were for completely different industries and therefore irrelevant).

Marriott notably did not challenge the applicability of ASTM Standard F1637 or ANSI Standard A1264.2 in its motion in limine, nor did it make a relevance objection at trial when Kendzior relied on the standards during his testimony. Instead, Marriott chose to contest the standards' applicability through Bowman's expert opinion. Bowman opined the standards were not applicable to Marriott because they were not binding through state law or a municipal ordinance and because they were developed primarily to address employee—not pedestrian— traction and safety. Both of Bowman's opinions are without merit.

The ASTM and ANSI standards discussed in this case "have not been given the force of law." *See Jorgensen v. Horton*, 206 N.W.2d 100, 103 (Iowa 1973) (concluding industry standards are "not conclusive on the issue of negligence"). But Alcala did not assert negligence per se, so the fact the industry standards do not carry the force of law does not mean they have no relevance in this case. *See Hansen*, 856 P.2d at 628 (concluding an ANSI standard was "relevant to the jury's consideration of whether defendant met the standard of care" even though the standard

was "purely advisory and not binding on anyone"); *see also Kent Vill. Assocs. Joint Venture v. Smith*, 657 A.2d 330, 337 (Md. Ct. Spec. App. 1995) (concluding "the fact that [an ANSI s]tandard has not been officially adopted as a regulation" did not "destroy its relevance as articulating a standard of care"). The majority erroneously attributes a negligence per se claim to Alcala when it states the district court told the jury the standard *was violated* by icy conditions. The district court did no such thing; it merely told the jury what the standard says and permitted the jury to conclude a violation, if one occurred, was some evidence of negligence.

Likewise, Bowman's opinion that the standards primarily address employees and not pedestrians does not preclude their relevance to the existence of a duty or its breach in this case. By analogy, although OSHA regulations normally set forth an obligation only between employers and employees, a violation of OSHA regulations is "evidence of negligence as to all persons who are likely to be exposed to injury as a result of the violation," even if the person exposed to injury is not an employee. *Koll v. Manatt's Transp. Co.*, 253 N.W.2d 265, 270 (Iowa 1977); *see also Smith v. Kris-Bal Realty, Inc.*, 576 A.2d 934, 938 (N.J. Super. Ct. App. Div. 1990) ("[T]he OSHA code . . . may be relied upon to illustrate industry standards and to provide support for the opinion of an expert on the proper standard of care . . . even though plaintiff was a business guest at the marina, not a worker."). The same principle is true here. Even if the ASTM and ANSI standards primarily address employee safety, "there are numerous areas traversed by both" employees and hotel guests—like the outdoor walkway on which Alcala fell. *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1282 (11th Cir. 2015). Accordingly, even assuming Bowman's opinion as to the primary purpose of the

standards is correct, it would not make them irrelevant in determining whether Marriott owed a duty of reasonable care to Alcala under the circumstances of this case. *See id.* at 1283.

The determination of whether a proffered industry standard is relevant to the existence of a duty under a given set of facts is a question of law for the court—not the jury. *See Hansen*, 856 P.2d at 628. Thus, in deciding the relevance of industry standards to the existence of a defendant's duty, the district court must make the decision—as the district court did in this case—even when presented with conflicting expert testimony. Some courts conclude industry standards are applicable and some conclude they are not, depending on the circumstances of the case—but the court decides the question of their relevance. *Compare Briere v. Lathrop Co.*, 258 N.E.2d 597, 604 (Ohio 1970) (concluding the trial judge did not err in determining industry standards were inapplicable "[i]n light of the conflicting testimony about industry adherence to the [proffered] rules"), *and Landsiedel v. Buffalo Props., LLC*, 112 P.3d 610, 617 (Wyo. 2005) (finding no reversible error in the trial court's "decision not to accept . . . industry standards as defining the minimum standard of care" given the parties' conflicting evidence as to the standards' applicability), *with Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 582 (5th Cir. 1985) ("Although the testimony was in dispute there was substantial evidence to indicate the relevancy of the ANSI standards . . . ."), *and Eagleburger v. Emerson Elec. Co.*, 794 S.W.2d 210, 231 (Mo. Ct. App. 1990) (en banc) (concluding a decision on ANSI standards' relevance "was a determination to be made by the trial court" even though "there was substantial evidence by plaintiffs that the ANSI

standards applied . . . and substantial evidence by [the defendant] that they did not").[6]

By giving Instruction 20 in this case, the district court clearly concluded the ASTM and ANSI standards were applicable and therefore relevant to the existence of Marriott's duty under the circumstances of this case. The majority concludes the instruction was erroneous because it means the court adopted Kendzior's opinion on applicability over Bowman's. But because the court, not the jury, decides whether the standards are relevant, that was its prerogative, and because the experts in this case were completely at odds, the district court could not have adopted both experts' views on relevance. Furthermore, even when a court concludes industry standards are applicable, it does not automatically follow that the court credits an expert's opinion as to *breach* of those standards. *See Keller*, 38 F.3d at 29. A jury could conclude, for example, that noncompliance with relevant industry standards "was excusable, and therefore not negligent." *Morgan v. State*, 862 P.2d 1080, 1083 (Idaho 1993).

I conclude Kendzior's expert testimony is substantial evidence amply supporting the district court's determination that the standards

---

[6]I acknowledge the highest court in New York has reached a different conclusion. *See Sawyer v. Dreis & Krump Mfg. Co.*, 493 N.E.2d 920, 925 (N.Y. 1986) ("The ANSI requirements . . . could be considered by the jury as some evidence of negligence if it first found that the standards set forth in the booklet represented the general custom or usage in the industry."). Accordingly, federal district courts applying New York law have also left the question of relevance of industry standards to the jury. *See Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 744 (W.D.N.Y. 2015); *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 43 (E.D.N.Y. 2010). My research reveals that many other courts addressing the question take a different approach allocating to the court the responsibility of deciding the relevance of industry standards to the existence of a duty. I find that approach consistent with the traditional allocation of responsibility between the court and the jury and would therefore adopt it in this case.

were relevant to Marriott's duty to exercise reasonable care. Having clarified the question of relevance of the standards was a question of law for the court, not a question of fact for the jury, I now turn to consider whether the court committed legal error by concluding ASTM Standard F1637 and ANSI Standard A1264.2 were relevant to the duty issue in this case.

My analysis of this question is slightly more difficult than it might be in other cases because neither party marked the ASTM and ANSI standards and caused them to be made part of the record. Nonetheless, the trial transcript reveals they were presented to the court and shown to the jury via a projector during Kendzior's testimony. Kendzior read from the standards and Instruction 20 contains verbatim language from them. Additionally, the standards' substance is published and available to this court. Thus, this is not a case where "the content of the [standard]s is not specified," which might make us "unable to determine from the record before us the relevance of the sections cited." *Gerace v. 3-D Mfg. Co.*, 522 N.W.2d 312, 318–19 (Iowa Ct. App. 1994).

While we often address industry standards in terms of admissibility, I conclude admission of them as an exhibit is not a condition precedent to their applicability and their relevance to the court's determination of the existence of a legal duty.[7] I find support for this conclusion in three cases.

In a Colorado case, the parties debated whether OSHA regulations were applicable. *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1168 (Colo. 2002)

---

[7]Although admitting industry standards as an evidentiary exhibit is not a condition precedent to the court's consideration of them in its determination of the duty question, I encourage the bench and bar in future cases to mark and identify them for inclusion in the record.

(en banc). "Specific regulations were not entered into evidence but were discussed extensively by various witnesses." *Id.* The court concluded "the jury should be permitted *to hear* evidence of [OSHA] regulations as some indication of the standard of care." *Id.* at 1170 (emphasis added). The court spoke in terms of "admitting evidence," but it is clear the evidence came solely—and permissibly—through testimony, not through an evidentiary exhibit. *See id.* at 1164, 1170.

In a Missouri case, an expert was "not allowed to cite . . . specific [standard]s" but did testify that "ANSI standards exist . . . and that he reviewed and considered those standards" in forming his opinion. *Ratcliff v. Sprint Mo., Inc.*, 261 S.W.3d 534, 550 (Mo. Ct. App. 2008). The *Ratcliff* court found no reversible error resulted from the ruling precluding the expert's reference to specific standards because the jury heard their substance through the expert's testimony. *See id.*

Finally, we have noted that private safety codes are on occasion a subject of trial testimony even when documents evidencing them are not received in evidence. *See Isaacs v. E. Iowa Light & Power Coop.*, 236 Iowa 402, 408, 19 N.W.2d 208, 211 (1945). In *Isaacs*, we noted the appellate record did not show a private safety code was offered into evidence. *See id.* at 408, 19 N.W.2d at 211. We concluded that fact alone resulted in no reversible error given that "some reference in the testimony to said code" was permitted and because compliance with the private safety code was not determinative of the defendant's compliance with the standard of care. *See id.* at 408–09, 19 N.W.2d at 211; *accord Cronk v. Iowa Power & Light Co.*, 258 Iowa 603, 612, 138 N.W.2d 843, 848 (1965) (concluding "[a]ctionable negligence may exist even though" a defendant complies with an industry standard or private safety code).

I conclude Alcala adequately presented the ASTM and ANSI standards at issue in this case in the district court so that the court could determine whether they were relevant to the existence of Marriott's duty of care. *Cf. Porter v. Omni Hotels, Inc.*, 579 S.E.2d 68, 71 (Ga. Ct. App. 2003) (concluding a plaintiff did not show an ANSI standard applied when he neither placed the standard into evidence nor presented expert testimony regarding the standard).

After reviewing the language of the standards discussed by the experts at trial and incorporated in Instruction 20, I would hold the district court did not err in finding them applicable and relevant to Marriott's duty of care. The ANSI standard clearly addresses snow and ice removal from pedestrian walkways. It is not part of a statute or ordinance, but the district court instructed the jury only that it could consider violation of the standard as evidence of negligence.

The ASTM standard is a closer question. Marriott contends Standard F1637 addresses only construction materials and design, so the notion that walkways must be slip resistant and that a slippery exterior walkway is substandard evaluates only the characteristics of the construction material used to build the walkway (in this case concrete), not any effects of weather on the walkway. That position has some intuitive appeal, but section 1.1 of Standard F1637 addresses construction standards *and* "minimum maintenance criteria." Furthermore, the standard also provides walkways should be slip resistant under "expected environmental conditions and use." Notably, the standard does not expressly exclude from its scope this particular class of persons, property, or circumstances. *Cf. Lynch v. Reed*, 944 P.2d 218, 224 (Mont. 1997) (concluding an ANSI construction standard was inapplicable because the provision setting forth the scope of the standard

expressly stated the standard did not apply to residential projects); *Kalish v. HEI Hosp., LLC*, 980 N.Y.S.2d 80, 82 (App. Div. 2014) (noting Standard F1637 "specifically identif[ies] bath tubs and showers as beyond the scope of the practices contained therein"). Nor is the standard obviously inapplicable because it is directed at an entirely different industry. *Cf. Aller*, 268 N.W.2d at 840–41 (concluding "safety standards in the metalworking industry" were inapplicable and irrelevant in a case involving the woodworking industry). Although ASTM Standard F1637 is couched in much more general terms than the ANSI standard, I conclude the district court did not err in finding it relevant to the court's determination of Marriott's duty and to the jury's determination of negligence. *See Williams v. Crane*, No. 2:14-CV-241 TS, 2015 WL 7176370, at *2 (D. Utah Nov. 13, 2015) (concluding, in a slip-and-fall case involving snow and ice, that "the ASTM Standard Practice for Safe Walking Surfaces"—which is number F1637—"may be helpful to the jury in determining reasonable safety practices for safe walking surfaces"). Accordingly, the district court did not err in giving Instruction 20.

**C. Continuing Storm.** The district court concluded the continuing-storm doctrine had no application under the facts of this case and declined Marriott's request for an instruction. Although the majority does not reach this issue, I conclude that, even without reaching the doctrine's continued vitality under the Restatement (Third), the district court did not err and should be affirmed.

We adopted the continuing-storm doctrine in 1953. *Reuter v. Iowa Tr. & Sav. Bank*, 244 Iowa 939, 943, 57 N.W.2d 225, 227 (1953). I generally agree with the majority's recitation of the history of the doctrine in Iowa, but I offer one additional point: There is a difference between a claim challenging the timing of snow removal efforts and a claim

challenging the manner of snow removal efforts. *Wailes v. Hy-Vee, Inc.*, 861 N.W.2d 262, 267 (Iowa Ct. App. 2014). A claim challenging the manner of snow removal is not subject to the continuing-storm doctrine because it merely seeks to enforce "the general rule that an actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." *Id.*; *see* 1 Restatement (Third) § 7(a), at 77; *see also Robinson v. Park Cent. Apartments*, 248 F. Supp. 632, 635 (D.D.C. 1965) ("The defendants undertook the task of clearing the sidewalk . . . . Even if there was no legal duty to do so, once a person voluntarily undertakes to perform a task, he [or she] is held to the requirement that it should be done free of negligence . . . ."); *Estep v. B.F. Saul Real Estate Inv. Tr.*, 843 S.W.2d 911, 914 (Ky. Ct. App. 1992) ("In this case, [the land occupiers] opted to attempt to clear their lot and sidewalks of ice and snow . . . . Since they chose to so act, they must act in a reasonable manner or be liable for their failure."); *Danner v. Myott Park, Ltd.*, 306 N.W.2d 580, 583 (Neb. 1981) (reversing a verdict in a defendant's favor, remanding for new trial, and disapproving of the continuing-storm instruction the trial court gave because it erroneously allowed the jury to find "that improper clearing of snow and ice . . . was of no consequence because defendant had a right to wait until the end of the storm before doing anything at all"). Because I conclude the evidence here did not justify a continuing-storm instruction in any event, I find it unnecessary to decide whether Alcala challenges the timing or manner (or both) of Marriott's snow and ice removal.

We have not had occasion to define the word "storm" precisely,[8] nor have we prescribed an outer limit of what might be considered a reasonable time for removing snow or ice from walkways after a storm ends under the continuing-storm doctrine. *See Frykman v. Univ. of Minn.—Duluth*, 611 N.W.2d 379, 381 (Minn. Ct. App. 2000) (declining to resolve a case as a matter of law because the facts did not establish "a clear-cut storm incident"); *see also Batie v. City of Humboldt*, 228 Iowa 528, 532–33, 292 N.W. 857, 859 (1940) (declining, in a pre-*Reuter* case, to conclude three hours between the end of a snowstorm and a plaintiff's fall was as a matter of law an unreasonable delay in addressing the hazard). However, in considering whether the evidence in this case supports Marriott's requested continuing-storm instruction, I keep in mind the rule's purpose and animating principle, as this court does in many other contexts. *See, e.g.*, *Baker v. Bridgestone/Firestone*, 872 N.W.2d 672, 678 & n.4 (Iowa 2015) (acknowledging the longstanding principle that the "humanitarian and beneficent purpose" of workers' compensation statutes informs our interpretation of them); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 378 (Iowa 2005) (keeping in mind "the underlying purposes of attorney discipline" when determining a sanction for ethical misconduct); *Renander v. Inc., Ltd.*, 500 N.W.2d 39, 42 (Iowa 1993) (declining to interpret a statute to "expand the legislature's narrow purpose").

The rule's purpose is essentially to prevent land occupiers from having to undertake Sisyphean tasks every time it snows. *See Reuter*, 244 Iowa at 943, 57 N.W.2d at 227. But not every weather event thwarts

---

[8]In particular, we have not been called upon to decide how severe a weather event must be to support a continuing-storm instruction.

cleanup. *See Powell v. MLG Hillside Assocs., L.P.*, 737 N.Y.S.2d 27, 29 (App. Div. 2002). "[I]f the storm has passed and precipitation has tailed off to such an extent that there is no longer any appreciable accumulation, then the rationale for continued delay abates, and common sense would dictate that the rule not be applied." *Id.* A weather event not presenting an ongoing deluge of subzero temperatures and blowing and drifting snow, *see Olejniczak v. E.I. du Pont de Nemours & Co.*, 79 F. Supp. 2d 209, 217 (W.D.N.Y. 1999), freezing rain, *see Rochford v. G.K. Dev., Inc.*, 845 N.W.2d 715, 718 (Iowa Ct. App. 2014), or slush and snow pedestrians might track into a building's vestibule, *see Parsons v. H.L. Green Co.*, 233 Iowa 648, 648–49, 10 N.W.2d 40, 41 (1943), does not present the kinds of changing conditions the continuing-storm doctrine addresses. *See Reuter*, 244 Iowa at 943, 57 N.W.2d at 227.

Courts in other jurisdictions have addressed allegedly ongoing storms and concluded a lack of changing conditions might render the continuing-storm doctrine inapplicable. For example, in *Powell*, the court found it important in rejecting the doctrine's application that "there was nothing more than trace amounts of precipitation during the two hour and 20 minute period . . . prior to the accident." 737 N.Y.S.2d at 29. In another New York case, the court questioned whether the analogous storm-in-progress rule applied when there was a two-hour window "between the cessation of freezing rain and the accident" during which normal (not freezing) rain fell. *Vosper v. Fives 160th, LLC*, 973 N.Y.S.2d 589, 590 (App. Div. 2013).

Of course, the continuing-storm doctrine "does not foreclose submission to the jury, on a proper evidentiary foundation, of the factual determination[] of whether a storm has ended." *Kraus v. Newton*, 558 A.2d 240, 243–44 (Conn. 1989). In one Connecticut case, the court

found sufficient the evidentiary foundation for a requested continuing-storm instruction because "climatological records . . . detailed a number of different types of weather between 7 a.m. and 4 p.m. on the day of the plaintiff's fall, including light snow, freezing rain, heavy rain, light rain and mist." *Umsteadt v. G.R. Realty*, 1 A.3d 243, 248 (Conn. App. Ct. 2010). However, when I evaluate this record while keeping in mind the continuing-storm doctrine's purpose, I conclude the district court correctly rejected the proposed instruction in this case.

The certified weather records in this case unquestionably show mist continuing from January 20 through the morning of January 21 in Moline and mist at some point on January 21 in Davenport. While those locations are a few miles from Bettendorf, we have long acknowledged that a certified weather record from a nearby observation point is "competent and relevant" evidence "for the purpose of showing the temperature and snowfall during the time it purport[s] to cover." *Huston v. City of Council Bluffs*, 101 Iowa 33, 39, 69 N.W. 1130, 1131 (1897) (accepting weather records from Omaha, Nebraska as indicative of weather in Council Bluffs, Iowa during the same time). But the mist did not present the types of changing conditions undergirding the continuing-storm doctrine. By 7:00 p.m. on January 20, over twelve hours before Alcala fell, the weather system was no longer producing measurable quantities of precipitation in nearby Moline and Davenport; nor did it feature other phenomena—like strong gusts of wind or blowing snow—that would have made cleanup and sidewalk safety precautions impractical.

Meteorological data from nearby Moline indicates no accumulations of precipitation after 7:00 p.m. on January 20. At most, the data from Davenport indicates a trace amount of precipitation was

observed on January 21. But the Davenport data lacks temporal specificity, so if the district court had given Marriott's requested instruction, the jury would have had to speculate that the trace accruing on January 21 occurred before Alcala fell around 8:00 a.m. "[S]peculation is not substantial evidence." *Sleeth v. Louvar*, 659 N.W.2d 210, 215 (Iowa 2003); *cf. La Due v. G & A Grp. Inc.*, 660 N.Y.S.2d 215, 216 (App. Div. 1997) (declining to grant summary judgment based on the storm-in-progress rule because while it was undisputed some snowfall occurred "on the date of plaintiff's accident, the meteorological records do not demonstrate the specific hours during which the snow fell"). Furthermore, the Davenport data reflects 0.01 inches of precipitation on January 25. Thus, the trace amounts on January 21 totaled even less than that. I would conclude as a matter of law that precipitation totaling less than 0.01 inches on January 21 did not impede Marriott's efforts to clear the ice from the sidewalk.

Indeed, the fact that Marriott claims to have made repeated efforts to clear ice and snow after all accumulation associated with the storm event stopped is compelling evidence that the weather in the early morning hours of January 21 posed no obstacle making removal of ice from Marriott's sidewalk impractical. This is not a case where a land occupier tried once in vain to clear a path but howling winds and relentless snowfall forced them inside to await the storm's passage, or a case where "[a] fairly warm autumn day . . . suddenly changed into a freezing winter's evening by an outburst of elemental fury." *Parks v. City of Des Moines*, 195 Iowa 972, 983, 191 N.W. 728, 733 (1923) (De Graff, J., dissenting). Rather, Marriott's employees attempted to clear—or at least represented that they did clear—the sidewalks at least six times between 6:00 p.m. on January 20 and 6:00 a.m. on January 21.

Nor did the lay testimony about the weather conditions on January 21 constitute substantial evidence supporting a continuing-storm instruction. Like the district court, I would conclude the majority of statements—for example, that "it was quite icy" and "there were accidents all over town"—simply described the effects of the January 20 storm event, not its continuation at a time material to Alcala's fall. At best, one or two witnesses testified that there was mist in the air on the morning of January 21. But I find no substantial evidence in this record tending to prove the weather was so inclement as to make it impractical to clear Marriott's sidewalk of ice before Alcala fell. Accordingly, I find no error in the district court's refusal to give the continuing-storm instruction Marriott requested.

Finding no error in the instructions given by the district court, I would vacate the decision of the court of appeals and affirm the district court judgment in Alcala's favor.

Wiggins and Appel, JJ., join this concurrence in part and dissent in part.